**Roberto MARTINEZ RODRIGUEZ et al., Plaintiffs,**

v.

**Irving JIMENEZ and Pedro J. Rodriguez Fortier, Defendants.**

Civ. No. 75–893.

United States District Court, D. Puerto Rico.

Feb. 18, 1976.

584

Stanley L. Feldstein, Francisco López Romo, Roberto Busó Aboy, Rafael Pérez Bachs, San Juan, P. R., for plaintiffs.

Arturo Díaz, Asst. Dist. Atty., Dept. of Justice of P. R., San Juan, P. R., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

TORRUELLA, District Judge.

Pursuant to an order to show cause entered herein on December 3, 1975, this matter was called for a consolidated hearing on the prayer for preliminary and permanent injunctive relief.

Plaintiffs appeared by their attorneys, Roberto Buso Aboy, Rafael Pérez-Bachs, Francisco López Romo, and Stanley L. Feldstein.

Defendants appeared by their attorneys, Roberto Armstrong, Jr., and Arturo Díaz, Assistant Solicitor General and District Attorney, respectively, of the Department of Justice of the Commonwealth of Puerto Rico.

The hearing was held on January 26, 27, and 28 and February 2, 1976, and the Court made a physical inspection of the San Juan District Jail on February 3, 1976. Thereafter, the Court requested briefs. Defendants have, to date, filed

no briefs. After consideration of the pleadings, the evidence adduced during the hearing and the observations made during the physical inspection, this Court makes the following

## FINDINGS OF FACT

1. The San Juan District. Jail, commonly known as "La Princesa" in the Spanish language, is a correction institution of the Commonwealth of Puerto Rico.

2. The plaintiff Roberto Martínez Rodríguez, and all members of the class he represents, are persons presently confined in the San Juan District Jail (hereinafter to as "La Princesa").

3. Defendant Irving Jiménez is the Administrator of Corrections of the Commonwealth of Puerto Rico, and in that capacity is charged with responsibility for the organization and administration of all correctional institutions in the Commonwealth of Puerto Rico.

4. Defendant Pedro J. Rodríguez Fortier is the Warden of La Princesa, under whose direct custody the plaintiffs are presently held.

5. La Princesa is housed in a building of masonry and wood, the construction of which was terminated in 1808, and which was first used as a jail in 1838. It has been used uninterruptedly for that purpose since that date.

6. Interior changes have been made to the building through the years, but the area inclosed by the outer walls of the building has not been enlarged.

7. La Princesa houses confinees already convicted and serving sentences, as well as confinees who are detained pending trial due to failure to post bond.

8. During the fiscal year July 1, 1974 to June 30, 1975, La Princesa had an average daily inmate population of 490.

9. During the first ten days of the month of December, 1975, the average daily inmate population of La Princesa was 467.6.

10. On February 3, 1976, the inmate population of La Princesa was 444 in the morning, and 457 at the time of the Court's inspection in the afternoon.

11. The inmate population includes persons who are mentally deranged, persons who are addicted to narcotics, and some minors as well. Minors as young as 15 and 16 years of age have been confined in La Princesa as recently as October 28, 1975 (Exhibit 36). At the present time between 35 and 40 minors are confined at the jail. Thus minors presently constitute approximately 7.5% of the average daily inmate population.

12. The area used for housing confinees consists of the following units:

| | |
|---|---|
| Gallery Summary I | 20' x 106' |
| Admission Gallery | 20' x 106' |
| Quarentine Gallery | 19' x 62' |
| Gallery Summary II | 43' x 128' |
| Workers' Gallery | 42' 10" x 83' 3" |
| Small Galleries | |
| I | 14' 5" x 16' 4" |
| II | 14' 5" x 16' 6" |
| III | 14' 5" x 16' 4" |
| 15 Dungeons ("calabozos") | 5' 6" x 12" |

The total area of the units used as living quarters for the confinees is therefore approximately 16,182 square feet.

13. Defendants contend that the rated capacity of La Princesa is 350. Nevertheless, on March 12, 1975, the defendant warden in reporting to his immediate superior in Administration of Corrections of the Commonwealth of Puerto Rico reported the population to be 580 on that date and stated that population to be "double the capacity that this (institution) can have." (Exhibit 15).

14. Defendant's witness, Jaime Torres Gaztambide, an architect retained by the Commonwealth of Puerto Rico to design and supervise construction of the new metropolitan regional institution in Bayamón, Puerto Rico, and who had previously rendered a report to the Commonwealth on existing institutions, testified that living area of not less than 10 feet by 7 feet should be provided for each confinee. Mr. Torres Gaztambide is a qualified expert in the field of design of correctional institutions and recognized as such by the Commonwealth of

Puerto Rico. On the basis of his testimony, this Court finds that 70 square feet per inmate is the minimum living area appropriate for confinement of each inmate, and the approximately 16,182 square feet provided by La Princesa for that purpose makes the maximum inmate population capacity of La Princesa to be 231 inmates.

15. On this basis, La Princesa was overpopulated on the following dates as indicated:

a. During fiscal year 1974–1975 (average) — 212%
b. First ten days of December, 1975 (average) — 202%
c. On February 3, 1976 — 198%

16. The overcrowding is aggravated by the necessity to segregate confinees for the purpose of security or discipline, and due to sexual deviation or mental condition. On February 3, 1976, the so-called "Small Galleries", for example, were populated as follows:

| Gallery No. | Area (Square Feet) | No. of Inmates | Area Per Inmate (Square Feet) |
|---|---|---|---|
| I | 234.7 | 13 | 18 |
| II | 237.6 | 12 | 19.8 |
| III | 234.7 | 10 | 23.5 |

17. The overcrowded condition of La Princesa is overstated to the extent that inmates are housed in the clinic, the area of which was not established by the evidence. On February 3, 1976, there were 10 inmates in the clinic. This variance is not significant and does not alter the conclusions reached. Dependence on average population also does not reflect accurately conditions existing from time-to-time. When large police raids are conducted, the population of La Princesa increases drastically. During the first quarter of 1975 the reports of the defendant warden to his superiors in the Administration of Corrections revealed the following population levels at La Princesa:

| Date | Population |
|---|---|
| February 24 | 556 |
| March 12 | 580 |
| March 31 | 597 |
| April 7 | 581 |
| April 9 | 802 |
| April 14 | 588 |

On these dates the population was between 240% and 347% of capacity. The overcrowding required the assignment of newly admitted confinees to sleep on the floor in hallways and in the corners of galleries, and even necessitating two confinees to sleep in the same bed. The defendant warden acknowledged the situation to be dangerous.

18. The overcrowding and the limited number of separate units makes classification of confinees impossible. Convicted inmates are housed together with confinees held in custody pending trial; drug addicts and sexual deviates are placed in units with other inmates; and minors are confined in the same units with adults. Mentally deranged inmates are placed in the dungeons, but some of those cells are also occupied by mentally competent confinees. Inmates with known dangerous propensities are admitted (Exhibits 13, 20, 21, 26, 33, 34, 35) and are not isolated (Exhibit 21).

19. La Princesa was regularly staffed by an average of 27.3 guards on a daily basis during the first ten days of December, 1975. Divided into three shifts, an average of 9.1 guards was thus available for duty on each shift. However, due to absences for illness and vacations, shifts of six or seven guards also occur. (Exhibit 12). At best there was one guard for each 51 inmates. The physical design of La Princesa does not permit an even distribution of guards for the inmate population. Thus, the guard at Post No. 8 is responsible for supervision of approximately 275 inmates in two dormitories, the barbershop, and the library. (Exhibit 22).

20. The combination of overcrowding and understaffing makes adequate supervision of inmates difficult, if not impossible. The defendant warden referred in his testimony to a riot which occurred at La Princesa in February, 1974, and during which he himself was taken hostage. (Exhibit 20). Inmates are subjected to rapes and serious physical attacks, some of which have resulted in the death of the victim. (Exhibits 20, 26, 27, 29, 32). Since adequate facilities

do not exist to keep the minors separated from the adults the majority of the minors have been involved in sexual acts, for which they refuse to accuse other inmate—for fear of reprisals. (Exhibit 36). The commandant of the guard on October 28, 1975, in a report to the defendant warden, stated frankly that the manliness of the minors (43 at that time) was being "commercialized", which situation the guards were unable to control. (Exhibit 36).

21. Insufficient beds are provided for the inmates at La Princesa. On January 30, 1976, there were beds for 426 inmates, not including those in the clinic. (Exhibit 39). The population on that date was not established, but on February 3, 1976, the population was 457 and there was no evidence that additional beds had been provided. Since nine inmates in the clinic were provided with beds, at least 22 inmates were without beds on that date. Between February 24, 1975, when the inmate population was 556, and April 14, 1975, when the population was 588, between 130 and 163 inmates were sleeping on the floor. (Exhibits 13–18). On March 31, 1975, 110 inmates were housed in the recreation room, which is equipped only with wooden benches. (Exhibit 16). Some of the beds do not have mattresses, and many of the mattresses are old, dirty, worn and torn. Many beds with mattresses do not have sheets. Even in the clinic, inmate patients sleep on the floor. (Exhibit 13). No beds are provided in the dungeons, although not all inmates confined there are subject to disciplinary measures. Some inmates in the dungeons sleep on mattresses on the floor; others sleep on sheets only spread on the concrete floor; and still others sleep on the bare floor.

22. Medical services at La Princesa are inadequate. One doctor is contracted to provide 16 hours of service weekly, from Monday to Friday. No doctor is available on weekends. The only record kept of the actual time spent at La Princesa by the doctor is his own handwritten time sheet, which for the month of December, 1975, discloses that the doctor did not work at La Princesa on Monday, December 1, and on every other day on which he was supposed to work shows he entered at exactly 6:30 A.M. and left at exactly 9:30 A.M. No record is kept of inmates seen by the doctor; no medical records of any kind are kept; and newly-admitted inmates are not given any physical examination. Inmates frequently are unable to see the doctor, either because the guards cannot or will not take them to sick call, giving as an excuse the absence of the doctor, or because the doctor is really absent. The equipment available in the doctor's consultation room is approximately that which any doctor might carry with him on a house call. Some medicines were stored in cabinets. The doctor gives prescriptions to inmates to be filled outside La Princesa at their own expense by family or friends of the inmates (Exhibit 38). Some inmates who are under treatment or medication when admitted have their treatment interrupted upon admission to La Princesa. Sufficient personnel and transportation are not available to take inmates to medical appointments outside La Princesa except in emergencies, and medications taken from inmates upon admission are not supplied to them as required. (Exhibit 11).

23. In August, 1975, a 25 year old inmate whose residence was in Mattapan, Massachusetts, was confined to La Princesa under bond of $500,000 for violation of the Innkeepers' Law. Eight days after confinement he died of a heart attack, several days after allegedly informing other inmates that he had a heart condition and was a diabetic. (Exhibit 23). The facts related are established by a report of the incident addressed to the defendant warden by the commandant of the guard, which was admitted into evidence without objection. The incident tends to support plaintiffs' contention that each confinee should be given a physical examination upon admission, particularly in view of the inadequate medical services available at La Princesa.

24. The clinic, or "hospitalillo" as it is called in Spanish, is used to house some inmates for other than medical reasons. (Exhibit 8). The doctor does not visit the clinic regularly. (Exhibits 3, 4, 9). One inmate has been confined there for more than a month with a bullet wound in the leg and has not yet been seen by the doctor. (Exhibits 3, 4). The conditions are deplorable. Some inmates housed there sleep on the floor. (Exhibits 3, 13). On February 3, 1976, personal inspection by the Court disclosed one inmate sleeping on the floor on a foam rubber mattress, with no cover, sheet, or pillow. The clinic becomes wet when it rains (Exhibits 3, 4) and water that collects on the roof filters through at times when it is not raining. (Exhibit 4). When the floor is wet the patient on the floor sleeps on a desk. (Exhibit 3). Recently, a piece of wood serving as a roof support fell on one of the patients in bed. (Exhibit 3, 28). The upper half of a hinged wooden door also fell and had not been replaced at the time of the physical inspection by the Court. Electrical switches, faceplates or outlets are missing, and exposed wires are covered with tape. The ceiling, which is partially of wood, shows discoloration around some exposed wires, indicating some type of combustion had taken place. The bathroom area is in a very bad state of deterioration and the ceiling again had electrical wires hanging down.

25. Adequate facilities for conferences between attorneys and inmates are not provided. For this purpose there is one room approximately 10 feet by 14 feet in area, equipped with one desk and one chair. This area adjoins the clinic, and the beams of the roof in this area as well are in bad state of disrepair. (Exhibit 28). There are two doorways to this area, one leading to the hallway at the front of La Princesa immediately inside the entrance, and the other leading to the waiting room for the doctor's and dentist's offices, where there are benches for inmates awaiting medical attention. There is also a stairway in this conference room which leads to a balcony above, from which there is an entrance to the barbershop. Privacy in these conditions would seem to be impossible. Certainly it is impossible to have more than one conference at any one time, and during the hours when the doctor or dentist is working, there must be traffic of inmates passing through the conference room. The door leading toward the medical offices is located immediately beside the desk in this room.

26. A small library with a desk and several tables is located on the second floor. It is under supervision of the guard at Post No. 8 who, as noted in Finding 19, is responsible for supervision of approximately 275 inmates in two dormitories and the barbershop, as well. This library contains approximately 200 volumes, but no evidence was presented that it contains any legal materials, and none were observed by the Court on inspection. Access to the library is obtained by requesting permission from a guard. Considering the number of inmates, the number of guards, and the apparent impossibility or unwillingness to take inmates to medical appointments, it is difficult to conceive of permission being freely granted.

27. A code of regulations governing disciplinary procedures has been promulgated. Copies are not given to new inmates. A copy is allegedly available in the library, to which, as noted, access is limited. The regulations are obviously not of significance in an institution where inmates are confined to the dungeons just because there is no other place to keep them. No copies of the regulations were observed on the bulletin board during the physical inspection, and there is no evidence of any regular program of informing confinees about the regulations. Inmates confined for a number of months have never seen the regulations and are not informed as to their content—(Exhibits 6, 10).

28. Inmates at La Princesa are not provided with adequate uniforms. The evidence establishes that some inmates have no uniforms at all (Exhibits 1, 11), others are given only partial uniforms in poor condition (Exhibit 7), and notwith-

standing defendants' testimony to the contrary, the evidence shows a lack of adequate supply. On March 12, 1975, the defendant warden informed his superiors in the Administration of Corrections that the supply of uniforms was exhausted (Exhibit 15). At the time of inspection by the Court on February 3, 1976, the warehouse area above the laundry, where the warden stated clothing was stored, did not contain any inventory of uniforms. The warden stated in the presence of counsel that the sergeant of the guard has some T-shirts, but the supply of other items was exhausted. This situation contrasts sharply with the warden's testimony that each inmate's uniform is laundered weekly, at which time he is issued a clean uniform. Since no inventory of clean uniforms is available, that procedure would seem somewhat difficult to accomplish. Plaintiffs' suggestion that inmates either do not wash their uniforms, or else must do without outer clothing while uniforms are laundered, accords with the facts found. There is no doubt that no underclothing is supplied to inmates, nor did the Court's inspection disclose any lockers or other facilities for keeping personal effects of inmates. Street clothing is kept in a separate area off the recreation room. The clothing deficiency is confirmed by a report from the commandant of the guard to the defendant warden on December 14, 1975 (Exhibit 37), in which the commandant states that the way in which a majority of the inmates appear for visiting hours is depressing and in which he requests that action be taken urgently to correct the condition.

29. On ingress inmates are not supplied with articles of personal hygiene, such as soap, toothbrushes, toothpaste, and towels. (Exhibits 2, 4, 7, 11). Some obtain these articles from other inmates. (Exhibit 4). The defendant warden testified that such articles are supplied to indigent inmates. No evidence was presented as to how indigency is defined or determined, when the determination is made and by whom, nor how soon after ingress the articles are supplied.

A commissary in La Princesa stocks such articles, except towels, and the parties stipulated that the stock was sufficient to supply all inmates who wished to purchase these articles. As noted, inmates are not provided with any facility for storing personal articles within the confinement units.

30. The evidence of physical abuse and violence in La Princesa is overwhelming. "Kangaroo" courts are held by inmates and sentences, including beatings and stabbings, are imposed. (Exhibits 6, 11). Gang rapes occur. (Exhibits 6, 7, 11). Weapons are not uncommon (Exhibits 6, 9, 11, 30, 31). Victims do not identify or testify against the aggressors as a result of threats and fear of reprisals. (Exhibits 6, 11, 10, 21, 26, 34, 35, 36). The presence of homemade knives fashioned from spoons and parts of metal food trays (Exhibit 11) is not surprising since food is served to some of the inmates in their galleries or cells by other inmates. The dearth of guards and the multiple numbers of inmates in each unit make close supervision and protection of inmates impossible.

31. Recreational facilities at La Princesa are limited and primitive. The large galleries each have a television set. The recreation room, with an area approximately 1759 square feet (Exhibit 39), is bare except for seven wooden benches of the type found in courtrooms or churches. Defendants testified that inmates are permitted to have radios and table games such as dominoes and checkers in the galleries. None were observed by the Court on the physical inspection on February 3, 1976. The outdoor recreation area consists of a patio open to the sun, with walls on all sides, paved with concrete which is rough, broken and cracked, and having an area of approximately 7,280 square feet (Exhibit 39). This area contains a vertical support holding one basketball backboard, ring, and net; two horizontal bars for gymnastics; and a roofed wooden bandstand. At the time of the inspection no other equipment or facilities were observed. The defendant warden testified that any

inmate who so desires may visit the outdoor recreation area for approximately two hours in the morning and one and one-half hours in the afternoon, Monday through Friday. The area available and its condition does not permit any organized sports activity such as softball or basketball if any substantial portion of La Princesa's population should be present in this recreation area at the same time. The exercise and recreation facilities are not adequate for inmates confined for any extended period of time, nor for the number of inmates presently confined in La Princesa.

32. The area referred to in testimony as the "little galleries" and the "dungeons", "galeritas" and "calabozos", respectively in Spanish, warrants special mention. This area is located on the first floor of the jail, and consists of a series of three larger cells and fifteen small cells constructed within a larger area, under a common roof about ten feet above the floor. The tops of the cells are enclosed with metal bars, as are the fronts where the doors are located. The three galleries and nine dungeons are located in a line, divided by concrete partitions, and fronting on a common hallway. Six additional dungeons are located in a line fronting on a hallway, at right angles to the other cells. The last six cells were not viewed on February 3, 1976, due to a disturbance which was occurring at the time and which was reported by defendant warden to involve a deranged prisoner. The common roof is in an extreme state of deterioration and disrepair. In the area of "little gallery" No. II, the roof is supported by pieces of 2" x 4" wooden beams braced against the overhead bars of the cell and the walls. The entire area is poorly lighted and poorly ventilated; it is stuffy and quite dark. The walls are grimy. In "little galleries" Nos. I and II, there are more inmates than beds. In the dungeons there are no beds. Some of the mattresses are in an extreme state of deterioration. The "little galleries" are equipped with one open shower, one toilet, and one urinal in each cell. The dungeons have only a toilet. In the an-

gle formed by the L-shape of this area, there are two open showers. These can be reached by the inmates only if they are removed from the locked cells. There are no facilities for drinking water except for the shower faucet on the wall or the faucet which flushes the urinal, which one inmate testified he uses. When questioned, this inmate stated that he uses paper cups obtained from servings of coffee, showing one, or empty refreshment cans. In the dungeons even these facilities are not available. Testimony was presented from a young law student who participated in a summer workshop with the Legal Aid Society about his visit to this area in July, 1975, at which time he noticed feces lying on the floors of some of the dungeon cells. This witness testified that inmates informed him that mentally deranged confinees threw feces on other confinees through the bars forming the ceiling and front of the cells. This testimony was corroborated by another witness who had been confined in the dungeons for four months as a security measure since he feared for his life. (Exhibit 10). The Court finds the testimony credible, particularly in view of the fact that mentally deranged inmates admittedly are confined to the dungeons and considering the statements of defendant warden to the Court during the course of the altercation that took place on February 3, 1976, and previously referred to herein.

33. Plaintiffs also charge defendants with failure to provide confinees at La Princesa with conditions comparably equal to those prevailing in other correctional institutions in the Commonwealth of Puerto Rico. This the defendant Rodríguez Fortier admitted in his answer to the original complaint, and both defendants adopted that admission in their answer to the amended complaint. The statement so admitted is therefore adopted as a finding. The defense that the limitations and conditions of La Princesa are temporary will be discussed below.

34. The total budget for La Princesa for the fiscal year 1974–1975 was $219,-

101. On the basis of average population of 490 inmates during that year, this budget provided approximately $1,225 per day per inmate. Actual expenditures during that fiscal year were as follows, with the daily expenditure per inmate computed on the basis of the average population of 490:

| Item | Amount | Daily Per Inmate |
|---|---|---|
| Articles of personal hygiene | $ – 0 – | $ – 0 – |
| Beds | – 0 – | – 0 – |
| Bedclothing | 16,800.00 | 0.094 |
| Uniforms | 15,212.74 | 0.085 |
| Cleaning equipment | 13,500.00 | 0.075 |
| Food (including special appropriation of $55,000.00) | 200,300.00 | 1.12 |
| Totals | $245,812.74 | $1.374 |

The Court takes judicial notice of the fact, established in another matter pending before this Court (Civil Case No. 75–357 [1]), that the Bureau of Prisons of the United States pays to the Commonwealth of Puerto Rico the sum of $7.00 per day for each federal confinee kept in custody in Commonwealth correctional institutions pursuant to contract between the Federal and Commonwealth governments. The amounts budgeted or spent for the care of confinees in La Princesa is grossly inadequate by comparison.

35. A new metropolitan regional institution is being constructed in Bayamón, Puerto Rico, with a capacity of 700 inmates. Barring unforeseen delays, that facility will be available for use on July 15, 1976. It is the intention of the Administration of Corrections of the Commonwealth to terminate the use of La Princesa as a correctional institution at that time.

36. Proposals for interim relief include moving guards' quarters and the warehouse to another building across the street from La Princesa, and conversion of those areas to additional inmate quarters for approximately 100 inmates. The additional building is an old building, presently unoccupied, with no windows, and appearing to require extensive repair before it can be occupied. No evidence of commencement of such repair and conversion was seen at the time of the view taken on February 3, 1976.

37. It is the finding of this Court that La Princesa is totally unfit and inadequate for use as a correctional institution, and could not be made fit without a complete renovation and interior rebuilding. The evidence of recent minor cosmetic repairs such as fresh paint on some bars and some walls does not alter the basic inadequacy of the physical plant and lack of facilities, nor the conditions in which the inmates are confined.

38. The defendant warden testified that another institution known as the Miramar Annex in San Juan houses only confinees who are minors. Yet another institution known as Camp Zarzal at Río Grande is utilized for confinement of narcotic addicts. The percentage of occupancy of the State Penitentiary at Río Piedras was not established by the testimony in March, 1975, the defendant warden suggested that two galleries of the State Penitentiary be devoted to housing unconvicted inmates from La Princesa. (Exhibit 15). The Court takes judicial notice of the fact that the Department of Health of the Commonwealth of Puerto Rico operates a psychiatric hospital at Río Piedras, not far from the State Penitentiary. No evidence as to its capacity or percentage of occupancy was presented.

39. On the basis of the foregoing, the Court finds that alternatives exist which permit interim remedial action until La Princesa is permanently closed as such on July 15, 1976.

40. The conditions described in these findings have been known to defendants for some time. The minimal corrective measures have been very recent and have not addressed the basic inadequacies of La Princesa. There is some evi-

1. In passing, the Court takes notice of the fact that in that case, pursuant to stipulation of the parties, La Princesa has been closed to detention of Federal prisoners since May 2, 1975.

dence of an attempt to dissuade plaintiffs from testifying, of refusing access to La Princesa of publicly-employed attorneys for the purpose of determining compliance with regulations governing defendants' activities, and from which it can be inferred that plaintiffs have difficulty in communicating with their attorneys. In view of this, access to La Princesa must be granted to attorneys for plaintiffs under reasonable circumstances, not only for the purpose of interviewing inmates in a conference room, but for physical inspection as well, in order to assure compliance with the terms of the injunction entered herein.

41. In defending this action, defendants have engaged in obstinacy and acted vexatiously.

## CONCLUSIONS OF LAW

The Court concludes as a question of law that:

■ 1. This action is properly brought as a class action pursuant to Rules 23(a) and 23(b)(2) for and on behalf of the class comprised of all persons presently confined or to be confined at La Princesa.

■ 2. This action is properly brought pursuant to the Civil Rights Act, 42 U.S.C. § 1983, in that plaintiffs, all of whom are state prisoners or defendants awaiting trial held by state authorities, are not challenging the fact or duration of their physical confinement itself, nor seeking immediate release or a speedier release from that confinement, but rather are challenging the conditions of their confinement. *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).

■ 3. Jurisdiction of this cause exists pursuant to 28 U.S.C. § 1343(3).

■ 4. The members of the plaintiff class who are pretrial detainees and not convicted inmates are entitled to all the rights of ordinary citizens except those necessary to assure their presence at trial and the security of the institution in which they are confined, and any deprivation or restriction of the detainees'

rights beyond those which are necessary for confinement alone must be justified by a compelling necessity. *Detainees of Brooklyn H. of Det. for Men v. Malcolm,* 520 F.2d 392, 397 (CA2, 1975).

■ 5. While prison inmates convicted of crimes do not have all the constitutional rights of citizens in society, and may hold some constitutional rights in diluted form, the guarantees of the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, at least, are secured to such inmates. *Nolan v. Scafati,* 430 F.2d 548 (CA1, 1970); *Palmigiano v. Baxter,* 487 F.2d 1280 (CA1, 1973); *Inmates of Suffolk County Jail v. Eisenstadt,* 494 F.2d 1196 (CA1, 1974).

■ 6. Even when a state confines a person by reason of a conviction of a crime, the state must assume an obligation for the safekeeping of that prisoner. *Finney v. Arkansas Board of Correction,* 505 F.2d 194, 201 (C.A.8, 1974.

■ 7. The quality of incarceration at La Princesa is punishment of such a nature and degree that it cannot be justified by the Commonwealth's interest in holding defendants for trial, and therefore it violates the due process clause of the Fifth or the Fourteenth Amendment. *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676 (D.Mass.1973), affirmed 494 F.2d 1196 (CA1, 1974), certiorari denied sub nom. *Hall v. Inmates of Suffolk County Jail,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974), ancillary relief affirmed 518 F.2d 1241 (CA1, 1975).

■ 8. The failure to provide confinees at La Princesa with conditions comparably equal to those prevailing in other correctional institutions in the Commonwealth of Puerto Rico effects an invidious discrimination with respect to those confined in said jail, and therefore violates the due process clause of the Fifth Amendment or the equal protection clause of the Fourteenth Amendment. *Inmates of Suffolk County Jail v. Eisenstadt,* supra, 360 F.Supp. at 688; *Rhem v. Malcolm,* 371 F.Supp. 594, 625

(SD NY 1974), affirmed and remanded 507 F.2d 333 (CA2, 1974).

9. Confinement in a jail where violence and terror reign violates rights secured by the Eighth and Fourteenth Amendments. *Woodhous v. Commonwealth of Virginia,* 487 F.2d 889 (CA4, 1973). The conditions in La Princesa, particularly sexual assaults, physical violence, inadequate protection by guards, indiscriminate mingling of confinees, and extreme overcrowding, constitute such a reign of terror.

10. The confinement of juvenile offenders to an institution in which unconstitutional conditions exist constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Finney v. Arkansas Board of Correction,* supra, 505 F.2d at 202.

11. The lack of any classification system at La Princesa, and the overcrowded condition, resulting in the confinement of detainees held for trial to the dungeons without any determination that these detainees require maximum security custody, constitutes a violation of their rights to due process by punishing them although they are unconvicted, and violates their rights to equal protection of the laws by unnecessarily treating them more harshly than convicts or bailees. *Rhem v. Malcolm,* supra, 371 F.Supp. at 624.

12. The failure to provide adequate beds or other sleeping facilities, the failure to provide adequate clothing, the failure to provide facilities and equipment for personal hygiene, and the failure to provide reasonably adequate facilities for exercise, constitute cruel and unusual punishment for convicted inmates, and violates the rights to due process and equal protection of the unconvicted detainees. *Inmates of Suffolk County Jail v. Eisenstadt,* supra, 360 F.Supp. at 689–690; *Johnson v. Lark,* 365 F.Supp. 289, 302 (ED Mo., 1973).

13. The inadequacy of the number of guards provided, when combined with the lack of a classification system and the admission of mentally deranged persons or those with known dangerous propensities, amounts to a denial of the rights secured by the Fifth, Eighth and Fourteenth Amendments.

14. The medical services provided to the plaintiff class are so grossly inadequate as to establish a deliberate indifference toward their medical needs, and thus violate rights secured by the Fifth, Eighth and Fourteenth Amendments. *Williams v. Vincent,* 508 F.2d 541, 544 (CA2, 1974); *Bishop v. Stoneman,* 508 F.2d 1224 (CA2, 1974); *Martinez v. Mancusi,* 443 F.2d 921 (CA2, 1970), certiorari denied, 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335 (1971).

15. Access to the courts is a fundamental constitutional right. The Sixth Amendment guarantees the right to the assistance of counsel. This includes the right of self-representation. Because these rights are basic to our adversary system of criminal justice, they are part of the due process of law that is guaranteed by the Fourteenth Amendment to defendants in the criminal courts of the States. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Assistance of counsel requires opportunity for consultation in conditions which will preserve the attorney-client privilege. Self-representation requires access to legal materials and facilities for their use and preparation of legal documents. The failure of the defendants in this cause to provide those conditions, materials and facilities constitutes a violation of the Sixth and Fourteenth Amendments. *Nolan v. Scafati,* supra; *Cruz v. Hauck,* 475 F.2d 475 (CA5, 1973); *Via v. Cliff,* 470 F.2d 271 (CA3, 1972).

16. It is basic to our system that punishment be imposed only on those who transgress the rules of our society. The rules of society within a penal institution are quite different in many instances from the rules in a free society. The concept of due process, guaranteed by the Fifth and Fourteenth Amendments, requires at the least that persons confined in such institutions be

informed of the rules and of the procedures by which they may be disciplined for a breach thereof. Placing a copy of the regulations in the library to which access is limited does not meet the constitutional standard. To the extent that confinees of La Princesa are subjected to disciplinary procedures without being informed or given an opportunity to become informed of the contents of the code of regulations governing such procedures, their right to due process is violated. *Palmigiano v. Baxter,* supra, *Inmates of Milwaukee County Jail v. Petersen,* 353 F.Supp. 1157, 1166 (ED Wis. 1973); *Hamilton v. Love,* 358 F.Supp. 338, 345–346 (ED Ark. 1973).

■ 17. Inadequate resources can never be an adequate justification for the state's depriving any persons of his constitutional rights, *Rozecki v. Gaughan,* 459 F.2d 6 (CA1, 1972); *Rhem v. Malcolm,* 507 F.2d 333 (CA2, 1974); *Gates v. Collier,* 501 F.2d 1291, 1320 (CA5, 1974); *Jackson v. Bishop,* 404 F.2d 571, 580 (CA8, 1968); *Hamilton v. Love,* 328 F.Supp. 1182 (ED Ark.1971), nor can the personal good faith of the individual defendants constitute a defense against equitable relief. *Rozecki v. Gaughan,* supra.

■ 18. The plaintiffs are suffering continuing violations of their constitutional rights and the defendants have demonstrated that they will take no corrective action unless obligated to do so. The plaintiffs have no adequate remedy at law due to the recurrent nature of the continuing wrongs, and the impracticability of multiple and recurrent suits in which damages are difficult of proof. In these circumstances injunctive relief is appropriate. *United States v. W. T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

■ 19. We are compelled to say that it has been difficult to hear the evidence in this case without mounting indignation and an overpowering sadness. La Princesa, a misnomer if ever one existed, is a notorious monument to man's inhumanity to man. Immediate and permanent closure of this institution would be the only appropriate and efficacious relief which this Court could grant under existing conditions. However, the evidence discloses that such relief may be effected voluntarily by the Commonwealth of Puerto Rico on or about July 15, 1976, when its new metropolitan regional facility will be ready for occupancy. This Court may not, and will not, permit continuing violations of constitutional rights when reasonable alternatives are reasonably available to alleviate the situation. The decree to be entered herein will make provision for interim relief which the Court believes to be reasonable and attainable, and jurisdiction of this cause will be retained for the entry of such additional orders as may be necessary to assure compliance by the defendants.

■ 20. Plaintiffs are granted attorneys' fees. *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 258–259, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Oppenheimer Mendez v. Acevedo,* 512 F.2d 1373 (CA1, 1975).

## JUDGMENT

This cause having been heard on plaintiffs' prayer for a declaratory judgment and injunctive relief, and the hearing having been consolidated as to preliminary and permanent injunctive relief by order entered herein, and the Court having filed findings of fact and conclusions of law after consideration of all evidence presented and the Court having found and declared that plaintiffs' constitutional rights are being and will continue to be violated by the defendants unless enjoined and restrained, to the immediate and irreparable damage of plaintiffs, now, therefore, after due deliberation, it is

ORDERED, ADJUDGED and DECREED that Irving Jiménez and Pedro J. Rodríguez Fortier, and each of them, their officers, agents, representatives, employees, attorneys, and all persons in active concert or participation with

them, be and they hereby are permanently enjoined and restrained from:

1. Admitting for confinement or continuing to confine at La Princesa any person who has not yet reached the twenty-first anniversary of his birth. This prohibition shall be applicable forthwith.

2. Admitting for confinement or continuing to confine at La Princesa any person known to be an habitual user of any substance classified in the Controlled Substances Act of Puerto Rico, 24 L.P. R.A. 2101–2607.

3. Admitting for confinement or continuing to confine at La Princesa any person as to whom the persons enjoined have or should have reasonable grounds to believe is mentally deranged or mentally defective to the point of making the confinement of said person among the other confinees dangerous to himself or others or disruptive of the tranquility or security of the institution.

4. Admitting for confinement, confining or continuing to confine at La Princesa at any time after April 15, 1976, more than a total of two hundred fifty (250) inmates, including both convicted persons and those detained for trial.

5. Confining or continuing to confine in the same cell or housing unit with convicted inmates serving sentences, any person detained prior to conviction of a crime.

6. Confining or continuing to confine any person in the fifteen (15) cells known as dungeons ("calabozos") except for disciplinary reasons, and then only one person per dungeon and only after provision of a functioning toilet unit and provision for a supply of drinking water. Adequate bedding shall also be provided for any such confinee.

7. Confining or continuing to confine more than four (4) persons at any one time in the cells known as little galleries ("galeritas").

8. Confining or continuing to confine any person in La Princesa unless such person is provided with a bed, mattress and bedclothing on which to sleep.

9. Restricting access to the library of any person at La Princesa, except so far as may be required by the regime of the institution applied on a non-discriminatory basis, and except so far as the physical facilities limit such access to a particular number of persons at any one time.

10. Confining or continuing to confine any person at La Princesa without supplying to that person at least one complete uniform consisting of shirt, pants, undershorts and socks, unless provision is made for any person not so supplied to use his personal clothing in lieu of such uniform.

11. Confining or continuing to confine any person at La Princesa without granting said person access to or providing the services of the laundry for washing and ironing his clothes at least twice each week.

12. Confining or continuing to confine any person at La Princesa without providing to that person a toothbrush, soap, towel, and a comb or brush, or in lieu thereof, permitting that person to use articles of personal hygiene of a similar nature which he may have in his possession on admission or which are supplied to him by others within twenty-four (24) hours after his admission.

13. Confining or continuing to confine any person at La Princesa without a medical examination by a medical doctor within twenty-four (24) hours after his admission. As to persons confined on the date that defendants receive notice of this judgment, such medical examinations shall be administered not later than March 15, 1976.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that Irving Jiménez and Pedro J. Rodríguez Fortier, and each of them, their officers, agents, representatives, employees, attorneys, and all persons in active concert or participation with them, shall make provision at La Princesa for the following services or facilities:

14. Each inmate shall have the right of access to a medical officer as often as the inmate shall so request, provided

that such requests, except in emergencies, shall be limited to one per day.

15. Medical records shall be established and maintained for each inmate, showing at least the date of each examination or treatment, the medical findings, and the medication or treatment administered.

16. An appropriate system shall be established and maintained for recording all medical appointments of inmates and medications to be administered to them and steps taken to assure that inmates are taken to medical appointments or medications supplied or administered to inmates at the appointed times.

17. The clinic ("hospitalillo") shall be repaired, painted and cleaned so as to provide reasonably sanitary and secure conditions, and a bed, mattress, and bedclothing shall be provided to each person confined to the clinic. Provision shall be made for daily visits to the clinic by a medical doctor for any inmate confined there who is unable to move to the doctor's consultation room.

18. An appropriate room or rooms shall be prepared for use by attorneys conferring with inmates, providing complete privacy for such conferences.

19. The library shall be supplied with those volumes of the Laws of Puerto Rico Annotated which include the Penal Code, the Rules of Criminal Procedure, and extraordinary remedies such as Habeas Corpus, which volumes shall be maintained current, and also those volumes containing the decisions of the Supreme Court of Puerto Rico published after January 1, 1950, all in the Spanish language.

20. Provide each inmate with a copy of the Regulations Governing The Disciplinary Procedures In Penal Institutions of the Commonwealth of Puerto Rico, in either Spanish or English as the inmate may request, at the time of the inmate's admission to the institution or not later than March 1, 1976, as to inmates confined at the time the defendants receive notice of this judgment.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that the defendants shall comply with each term of this injunction for which another compliance date is not fixed, on or before April 1, 1976, unless this Court, upon application of the defendants, shall fix a later date for compliance with any specific requirement hereof.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that Irving Jiménez and Pedro J. Rodríguez Fortier, and each of them, their officers, agents, representatives, employees, attorneys, and all persons in active concert or participation with them, be and they hereby are permanently enjoined and restrained from utilizing the facilities in which La Princesa is presently located as a correctional institution from and after August 1, 1976.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that jurisdiction of this cause is retained until further order, and that any attorney representing plaintiffs in this action, but not more than two attorneys at any one time, shall be permitted to visit and inspect any part of La Princesa at any time without prior notice between the hours of 8:00 A.M. and 5:00 P.M., provided, however, that such visits shall not exceed three in any one week.

The parties are further granted seven (7) days within which to submit names of persons from among which the Court may name a Master to oversee compliance with this order.

Costs are hereby taxed against defendants and they are further ordered to pay attorneys' fees in the amount of $6,000.