**Albert BLAKE, et al.,
Plaintiffs-Appellants,**

v.

**Frank A. HALL, et al.,
Defendants-Appellees.**

No. 80–1792.

United States Court of Appeals,
First Circuit.

Argued Sept. 10, 1981.

Decided Dec. 18, 1981.

Certiorari Denied May 17, 1982.
See 102 S.Ct. 2257.

Judith A. Stalus, Boston, Mass., with whom Norman Zalkind and Michael Avery, Boston, Mass., were on brief, for plaintiffs-appellants.

Lee Carl Bromberg, Sp. Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., and Bromberg, Sunstein & McGregor, Boston, Mass., were on brief, for defendants-appellees.

Before ALDRICH, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Plaintiffs-appellants, inmates at the Massachusetts Correctional Institution Walpole (Walpole), brought a 42 U.S.C. § 1983 civil rights class action alleging that the condi-

tions of their confinement amounted to cruel and unusual punishment. Declaratory and injunctive relief, as well as damages, were sought. Named as defendants were Frank A. Hall, former Commissioner of Correction, Larry R. Meachum, Commissioner of Correction at the time of trial, and Frederick A. Butterworth, former Superintendent of Walpole. The damages case was tried to a jury which returned a verdict in favor of the three defendants.

The judge, a year after the verdict, issued a written opinion finding no constitutional violations and denying injunctive relief.

The main issue on appeal is whether the evidence of conditions at Walpole compelled a finding of cruel and unusual punishment either as to the entire institution or as to certain sections of it. The attack on the jury verdict is confined solely to the claim that plaintiffs' motion for judgment notwithstanding the verdict should have been granted. There is one related issue: whether the court should have amended its findings of fact and judgment and received new evidence in regard to a section of Walpole (New Man's Section).

We start with defendants' contention that the seventh amendment required the district judge to accept as binding the findings of fact made by the jury in reaching its verdict. The landmark case in the joint law-equity trial area is *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). In *Beacon Theatres*, the Court stressed the importance of the jury as a fact-finding body and held that, although the complaint sought only declaratory and injunctive relief, because the counterclaim demanded a jury trial of the factual issues, the jury issues had to be tried first. The Court was concerned that if the equitable issues were decided first by the trial judge, the defendant's seventh amendment right to a full jury trial of the counterclaim might be foreclosed by the doctrine of collateral estoppel. "The controlling principle of the Beacon Theatres case is the

desire to protect jury determination of common issues." 9 C. Wright & A. Miller, Fed.Prac. & Proc.Civil § 2338, at 136 (1971). The problem in this case is determining what issues were decided by the jury in reaching its verdict. The charge instructed the jury in effect as follows. In order to recover, plaintiffs had to prove a deprivation of a constitutional right by one of the defendants. Such deprivation had to be the result of deliberate conduct or the reckless failure to act. The jury was also instructed that if plaintiff had deliberately created or substantially contributed to causing the unsanitary conditions (garbage and filth, including human excrement on the floors and walls of the cell blocks), which they alleged were unconstitutional, they could not recover.

■ Under these instructions, which have not been appealed, the jury could have made three findings in reaching its verdict: (1) that there were no constitutional violations; (2) if there were unconstitutional conditions, they were not caused by the deliberate or reckless conduct of the defendants; and (3) if there were unconstitutional violations, they were caused or substantially caused by the plaintiffs themselves. The jury could, of course, have reached all three conclusions. But the general verdict of no liability precludes further analysis. The district judge was not bound by the jury verdict in determining whether equitable relief should issue because there was no way to determine what common issues were decided by the jury.[1]

■ We turn now to the main issue of whether conditions at Walpole compelled a finding of cruel and unusual punishment either as to the institution or sections of it. We review the facts and all the reasonable inferences to be drawn from them in the light most favorable to the defendants. *Hawkins v. Hall*, 644 F.2d 914, 915 (1st Cir. 1981). And, "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of

---

1. The opinion of the district judge does not suggest in any way that he felt bound by the jury verdict.

the trial court to judge of the credibility of the witness." Fed.R.Civ.P. 52(a).

██ Even in a prison setting, there are no rigid standards as to what does and does not amount to cruel and unusual punishment. Penal measures must be evaluated against "broad and idealistic concepts of dignity, civilized standards, humanity and decency" and "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), quoting *Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir. 1968), and *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). In *Hutto v. Finney*, 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1977), the Supreme Court held that the punishment must not be grossly disproportionate to the offense and must not offend society's evolving sense of decency. This circuit has applied these two benchmarks for determining whether prison conditions violated the eighth amendment in *Hawkins v. Hall*, 644 F.2d at 917, and *Nadeau v. Helgemoe*, 561 F.2d 411, 413 (1st Cir. 1977).

The gravamen of the complaint is that the unsanitary and filthy conditions of Walpole compounded by inadequate lighting, heating and ventilation, amount to cruel and unusual punishment. Plaintiffs' evidence depicted Walpole as a charnel house out of the middle ages. Although defendants did not suggest that the prison was a rose garden, their evidence was that, while there was definite room for improvement, conditions did not violate eighth amendment standards.

Before summarizing the evidence, it is necessary to describe the prison. Walpole is not an old facility compared to many state prisons. It was opened in 1955 with a capacity for 666 inmates. At the time of trial, there were 580 prisoners; the average population is about 600.

There are thirteen cell blocks plus two small cell areas, the New Man's Section and the infirmary.[2] Each inmate has his own cell which is furnished with a bed, bedding, mattress, table, chair, a sink with hot and cold running water and a toilet. The prisoners are classified into different groups and each group is assigned to separate cell block areas.

Blocks A 1–A 4 house medium-security inmates. There are a total of 261 cells. Blocks A 1, A 2 and A 3 are each rectangular with the cells located along two exterior walls. There are three tiers of cells consisting of twelve cells to a tier on each side of the central area of the block which is known as the "flats." The cells on the second and third tiers onto a catwalk with stairways going down to the "flats." Each cell has a window in the exterior wall looking outside onto the prison grounds. A solid steel door with a small observation window opens to the central area of the block. Block A 4 has three tiers of fifteen cells, each along an interior wall, facing a blank wall with an officer's observation gallery. These cells have three solid sides with a grille door facing onto the flats. Ventilation is supplied by a combination heat and air circulation system.

Cell Blocks B 6 and B 7 are occupied by those inmates who have recently arrived at Walpole and have not yet been classified. Each block contains forty-five cells and is identical to Block A 4.

Maximum security inmates are housed in Blocks B 1–B 4. Each block has forty-five cells arranged in three fifteen-cell tiers identical in layout and construction to Blocks A 4, B 6 and B 7.

Block 10 contains those inmates whom the administration believes to be the most disruptive, violent and difficult to control. It consists of four tiers of fifteen cells each, two tiers back-to-back on the ground level, and two tiers above them. The upper tier cells have three solid walls and a grille door opening onto the central corridor. The lower level cells have a solid steel door with an observation window that closes over the grille door.

Protective custody inmates, those who fear physical harm from other prisoners,

---

**2.** The infirmary cell block is not a factor in the case.

are housed in Blocks A 6 and B 9. Block A 6 is identical to Blocks B 1, B 4, B 6, B 7 and A 4. Block B 9 has an upper and lower level. The lower level consists of three five-cell tiers. Each cell has three solid walls, a grille wall with a grille door in it facing onto the corridor. The upper level has two back-to-back tiers of ten cells each. Each cell has a grille door in a solid wall and a solid steel door that can be closed over the grille.

The New Man's section is an eight-cell unit located beneath the infirmary. It has no natural light or ventilation.

There are showers for each cell block.

Walpole also includes a kitchen, food storage area, dining hall and inmate canteen. There are outdoor recreation yards, a gymnasium, indoor recreation rooms and places for program activities. A law library and regular library are provided. The prison also contains visiting rooms, an avocation area, a laundry, a barbershop, shop and industrial areas, an auditorium and chapels. There are administrative offices and security facilities. Walpole has its own power plant and maintenance facilities.

We focus first on the sanitary conditions in the maximum security section of Walpole, Blocks B 1 to B 4 and Block 10, because they were the worst in the prison. The testimony of plaintiffs' witnesses can be summarized as follows. Many of the toilets in the cells had been broken and did not work. Sinks in a number of cells were plugged up and did not drain properly, and many of them were broken and had sharp edges. The floors and walls were caked with dirt, grime and human excrement. The floors were so covered with garbage and debris that it was difficult to walk on them. Because of leaks in the roof, after a rainstorm the floors became wet and slimy. Most of the plumbing fixtures in Block 10 were so old that corrosion and layers of paint made cleaning impossible. Many windows were broken and without screens. Because of poor ventilation and the way the heating system worked, inmates on the top levels were roasting while those on the ground level were cold. The showers were filthy and moldy and they stank. What shower curtains there were, were covered with slime and grime. Howard Wensley, Director of Regional Operations for the State Department of Public Health, testified that these blocks were unfit for human habitation, as did two other expert witness called by plaintiffs, Wesley Eugene Profit and Joseph G. Cannon.

Defendants admitted that sanitation in the maximum security blocks was a continuing problem, but testified that they were doing their best to cope with it. The unsanitary conditions, according to defendants, were due mainly to openly defiant inmates who threw paper, food, garbage and their own excrement on the floors and walls. A system of inmate "runners" is used to keep the cell blocks clean. Four runners per cell block have the duty to remove trash and keep the floors, walls and shower facilities clean. Each inmate has the responsibility for keeping his own cell clean and is furnished the necessary materials to do so. This system has broken down from time to time in the maximum security blocks. When this happens and sanitary conditions become intolerable, a "lockup" is imposed and correction officers try to clean up. They have been impeded in their efforts to do so by inmates who throw excrement, food, and garbage at them. Block 10 has been a particularly difficult problem because of its volatile inmates. The runner system had to be abandoned some months prior to trial; since then, correction officers have done the daily cleaning. Sanitary conditions are dependent upon the defiance mood of the inmates and, at times, the upper two tiers of Block 10 were practically spotless. In 1978, Block 10 received a thorough cleaning and repainting. At the time of trial, the maximum security blocks were in the process of being scraped, thoroughly cleaned, and repainted. All occupied cells had plumbing in working order at the time of trial. Plumbing repairs are made as promptly as possible, usually within twenty-four hours. A capital outlay budget has been provided to upgrade the plumbing system.

The evidence relating to other sections of the prison was also conflicting. There was testimony of a rodent and cockroach infestation so severe as to pose a danger to health. This was countered by testimony that the problem was not any worse than that encountered in any large institution. Evidence of continued health code violations in the kitchen and eating area was met by testimony that this was not unusual in a facility of this size and that no specific instances of disease, illness or accident due to code violations had occurred.

Plaintiffs' evidence as to conditions in the New Man's Section was, for the most part, uncontroverted. Its subterranean location results in a complete lack of natural light and ventilation. There was no mechanical ventilation. Water seeps through the walls and ceilings, and sewage backs up periodically. Plaintiffs' expert, the Director of Regional Operations for the Massachusetts Department of Public Health, testified that the New Man's Section was unfit for human habitation and could not be made fit. There is no opportunity for out-of-cell or outdoor exercise for the inmates. Defendants impliedly admitted to the existence of these conditions by testifying that use of this section is severely restricted, that it has been emptied from time to time, that a thirty-day limit has been put on confinement there, and that it is planned to close this section when the population of the prison has declined sufficiently.

Plaintiffs also claimed that the idleness of many prisoners not only contributed to unconstitutional conditions, but that idleness was deliberately forced on the Block 10 inmates as a form of punishment. Another claim of a constitutional violation was based on the undisputed fact that those housed in the lower tiers of Block 10 and the New Man's Section were not afforded the opportunity to exercise out of their cells or outdoors.

Defendants' evidence emphasized that Walpole as a whole is adequately operated. Inmates are provided with a nutritious diet, adequate heat, light and ventilation, an adequately equipped private cell, good medical care, personal hygenic and cleaning supplies, necessary clothing and bedding materials, regular indoor and outdoor exercise, regular visits, ready access to attorneys and a law library, religious counseling and services, hobby and vocational programs, and job opportunities for a good number of inmates.

The district court made specific findings on all of the claims made. It found that inmates were not denied the right to reasonable exercise, that there was not a policy of deliberate idleness forced upon inmates of Block 10 in order to punish them. It held that idleness "did not present a picture of constitutional violation." As to sanitary conditions, the court found that, although "they leave a great deal to be desired, that, however, they are not shocking or barbarous and do not transgress the Constitutional standard. The problems of which complaints were made were created by the plaintiff class, in large measure." After reciting the factors that it had taken into consideration, the court stated: "In summary, the plaintiffs have failed to establish by a fair preponderance of the evidence that the inmates at Walpole have been subjected to cruel and unusual punishment in violation of the Eighth Amendment, in the blocks, in the New Man's Section, or by reason of conditions in the kitchen area. The conditions complained of were created by the plaintiffs' own conduct in the cell blocks." The court concluded: "The conditions of confinement of the inmates at Walpole are not barbarous to the extent that they offend society's evolving sense of decency. *Nadeau v. Helgemoe,* 561 F.2d 411 (1st Cir. 1977). The sanitation problem in the cell blocks was created by the plaintiffs themselves."

The thrice-repeated statement that the conditions in the cell blocks were created by the prisoners themselves raises a question as to what standard the court applied in finding that these conditions did not transgress constitutional requirements. We do not quarrel with the factual basis for the finding—there was sufficient evidence for it. But the place it is given in the

opinion—each time after a finding of no constitutional violation—suggests that the court might have premised its ruling that the cell block conditions did not amount to cruel and unusual punishment on the fact that the prisoners caused or contributed to cause the conditions themselves. Although we would agree that in an action for damages the conduct of the plaintiffs-prisoners might bar them from recovering, we do not think that, under the facts here, the conduct of the prisoners was a factor to be considered in determining whether the cell block conditions amounted to cruel and unusual punishment. There was no evidence from which it could be found that all of the inmates, or even a majority of them, were responsible for the conditions. We see no reason why well-behaved inmates should have to suffer cruel and unusual punishment because of the actions of some disruptive ones. Despite the district court's findings, the prison administration must bear the ultimate responsibility for cell block conditions.[3] To rule otherwise would mean, in the final analysis, that the prison was being run by the inmates, not by those charged by law with its administration. We realize that prison administrators do not have an easy task, but dealing with violent and disruptive men without violating the cruel and unusual punishment proscription of the eighth amendment is their job. The Eighth Circuit put it well in *Wycoff v. Brewer*, 572 F.2d 1260, 1267 (8th Cir. 1978):

> It must be realized, however, that prison administrators are required to deal in a constitutional manner with convicts who are violent and unruly as well as with those whose conduct is exemplary or at least peaceful. And while prison officials must have some latitude in imposing conditions reasonably necessary to control a prisoner's behavior, the contributory fault of an inmate does not necessarily deprive him of his right to relief from deprivations of constitutional dimension.

We have been unable to find any case holding that equitable relief from unconstitutional living conditions should be denied because the conditions were created in whole or in part by some of the prisoners. Although the law in this area has not yet jelled, the cases point in the direction of the position we take. In *Ramos v. Lamm*, 639 F.2d 559, 569–70 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981), the court noted that one of the defenses of the prison officials was that the unsanitary conditions were due to an absolute refusal by the inmates to help keep the prison clean. The court, nevertheless, held the prison administration responsible for the trash, decayed food, and other material that routinely littered the corridors. In *Palmigiano v. Garrahy*, 443 F.Supp. 956, 963–64 (D.R.I.1977), the district court placed primary responsibility for sanitation on the administration, although it acknowledged the inmates' role as well.

The contributing role of the inmates in creating unsanitary conditions was remarked upon in the extensive litigation concerning the Arkansas prison system. Although the prison officials did not raise it explicitly as a defense, the prisoners' role did not preclude the court from ordering relief. *See Holt v. Sarver*, 309 F.Supp. 362, 378, 384–85 (E.D.Ark.1970), *aff'd*, 442 F.2d 304 (8th Cir. 1971). In a later Arkansas case, the court, in finding that conditions had deteriorated rather than improved, observed that acts of vandalism and personal violence by the inmates were the result of overcrowding and other unconstitutional conditions. *Finney v. Hutto*, 410 F.Supp. 251, 276–77 (E.D.Ark.1976), *aff'd*, 548 F.2d 740 (8th Cir. 1977), *aff'd*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

An analogy may be made to the eighth amendment right to be reasonably protected from violence in prison. *See Gates v. Collier*, 501 F.2d 1291, 1309 (5th Cir. 1974); *Woodhous v. Virginia*, 487 F.2d 889, 890

---

**3.** The court did not comment directly on the testimony of Joseph G. Cannon, an expert with twenty-seven years' experience in state correctional work, including three years as Commissioner of Correction for the State of Kentucky, that the unsanitary conditions were due to lack of supervision by the administration.

(4th Cir. 1973) (per curiam); *Martinez Rodriguez v. Jimenez*, 409 F.Supp. 582, 594 (D.P.R.1976); *Pugh v. Locke*, 406 F.Supp. 318, 329–30 (N.D.Ala.1976), *aff'd sub nom. Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977), *rev'd on other grounds sub nom. Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). Such violence is clearly the "fault" of the prisoners, yet prison officials are constitutionally required to prevent it.

█ We do not mean to suggest that prison officials cannot require inmates to keep their cells and living space clean. This can be done by any combination of discipline and reward that is appropriate and does not violate the eighth amendment. What we hold is that the prison administration must see to it that unsanitary conditions do not continue unabated because the conditions were first caused by the inmates themselves. Cleanups must be conducted regularly, although they benefit those who made the mess as well as those who did not.[4]

Because it is not clear whether the finding that the prisoners created the cell block conditions prompted the ruling that there was no constitutional violation, we remand[5] to the district court to determine, without regard to the role of the prisoners, whether the conditions in any of the cell blocks amount to cruel and unusual punishment.

We also must question the court's conclusion that conditions in the New Man's Section did not amount to cruel and unusual punishment. It is difficult for us to understand why confining men in a dungeon even with a thirty-day limit under the conditions described, and which were essentially uncontroverted, does not offend society's evolving sense of decency. *See Hawkins v. Hall*, 644 F.2d at 917–18. The New Man's Section is reminiscent of the middle ages, not a penal institution opened in 1955. We think the court's finding must have been influenced by testimony of the defendants that they intended to close the New Man's Section. On page five of its opinion, the court ended its description of this section by stating: "It is intended that this section be closed." The court also found: "So far as the New Man's Section is concerned, no man may presently be placed there against his will." It is true that Thomas McLaughlin, Associate Deputy Superintendent, testified that the New Man's Section was the safest place in the prison and that some inmates went there for protection, but we are hard put to find any evidence that the section was limited to volunteers. Moreover, in finding that no man may be placed in the New Man's Section against his will, the court overlooked the realities of prison life at Walpole. It was referring to prisoners who, because of the fear that if they were kept in the general prison population they would be physically assaulted or killed, had asked for protective custody. Given the Hobson's choice of the New Man's Section or the risk of death at the hands of other inmates, they naturally chose to stay alive. In this connection, we note the uncontradicted testimony of Wesley Profit, a clinical psychologist with special emphasis on delinquency in crime. Profit ran a program at Walpole from 1976 to 1978 on race relations for the maximum-security inmates. He testified *inter alia* that Walpole has a national reputation for being one of the most violent prisons in the country with a significant number of inmate murders.

---

**4.** This is not to say that identifiable inmates who create unconstitutional conditions, or thwart the efforts of prison administrators to keep prison conditions up to constitutional standards, are necessarily entitled to relief from the very conditions they themselves create. Depending on the circumstances, such individuals might well be estopped from relief against self-imposed conditions. The administrators, however, owe a duty to the other inmates to see that the conditions in which they live are up to standard, and if constitutional conditions cannot be maintained in one location because of the misconduct of certain unruly inmates, then those inmates who are not responsible must be moved to a location where their rights can be secured, or the unruly inmates must themselves be relocated. This is much the same as the duty owed to protect inmates from the violence of other prisoners.

**5.** *See Nadeau v. Helgemoe*, 561 F.2d 411, 418–19 (1st Cir. 1977), for an example of another prison case remand due to ambiguities in the district court's rulings.

After the findings and judgment were handed down, plaintiffs moved to amend those portions that had to do with the New Man's Section, asserting that the defendants' plan to close the New Man's Section was not carried out in the year that passed between the trial and the findings, and that defendants have continued to use the New Man's Section for inmates who would otherwise be held in Block 10. Plaintiffs also moved to strike that portion of the findings in which the court found that "no man may presently be placed there [New Man's Section] against his will." If defendants changed their intention to close the New Man's Section and also its use between the date of the jury verdict and when the findings were issued, the district court's determination of whether there was a violation of the eighth amendment may be affected. We think that plaintiffs should be given an opportunity to prove their allegations that defendants no longer intend to close the New Man's Section and that its use changed between the end of the trial and the date the court's findings were issued. If the court finds that defendants intend to continue to use the New Man's Section, then it should determine whether the conditions prevailing at the time of the new hearing constitute cruel and unusual punishment.

We have read the entire record carefully and considering our standard of review, the clear error rule, and the discretion a trial judge has in making credibility determinations, we uphold all findings except those as to the cell block conditions and the New Man's Section.

We also affirm the district court's denial of plaintiffs' motion for judgment notwithstanding the verdict.

*Affirmed in part and remanded for further proceedings consistent herewith.*