Flora SANTANA, et al., Plaintiffs,

v.

Jenaro Collazo COLLAZO, et al., Defendants,

United States of America, Plaintiff-Intervenor.

**Civ. Nos. 75–1187, 75–1213 and 75–1466.**

United States District Court, D. Puerto Rico.

Feb. 15, 1982.

---

Maria Laura Colon, Heriberto Quinones Echevarria, Roberto Fernandez Coll, Puerto Rico Legal Services, Hato Rey, P. R., Harry F. Swanger and John R. Bird, National Juvenile Law Center, St. Louis, Mo., for plaintiffs.

Robert D. Dinerstein, Yolanda Orozco, Mary E. McClymont, U. S. Dept. of Justice, Civil Rights Division, Washington, D. C., for plaintiff-intervenor.

Donato Rivera de Jesus, Marcos A. Ramirez Lavandero, Ramirez & Rivera, Marvin Diaz Ferrer, Hato Rey, P. R., for defendants.

Heriberto Quiñones Echevarría, P. R. Legal Services Corp., Hato Rey, P. R., co-counsel of plaintiffs.

## DECISION AND ORDER

TORRUELLA, District Judge.

After a long and tortuous road,[1] this case is ready for adjudication on the merits. It is a consolidation of three separate suits, *Santana v. Collazo*, Civil Number 75–1187 (filed on October 20, 1975), *Olivo v. Ríos*, Civil Number 75–1213 (filed on October 24, 1975) and *Ibáñez v. Ríos*, Civil Number 75–1466 (filed on December 22, 1975). In these suits Plaintiffs allege that juveniles confined in the Mayaguez Industrial School in Mayaguez, Puerto Rico ("Mayaguez"), and the Maricao Juvenile Camp in Maricao, Puerto Rico ("Maricao") are being denied their constitutional rights. On August 10, 1976 these actions were certified as class actions, the class being composed of all present and future juveniles who are committed to the Industrial School and Juvenile Camp.

Plaintiffs' complaints were filed pursuant to 42 U.S.C. § 1983 and seek declaratory and injunctive relief pursuant to 28 U.S.C. §§ 1651, 2201 and 2202. They claim in substance, that Defendants acting under color of state law deprived Plaintiffs of their constitutional and civil rights, including, inter alia, the right to due process of law prior to denial of liberty, the right to be free from cruel and unusual punishment, the right to be free from involuntary servitude, the right to equal protection of the laws, and the right to rehabilitation and treatment services. More specifically Plaintiffs claim: (1) utilization of extensive seclusion in solitary confinement without basic necessities and treatment service; (2) prolonged disciplinary confinement imposed without due process; (3) lack of individualized, comprehensive rehabilitation plans; (4) inadequate opportunities for education and rehabilitation; (5) inadequate medical

1. See *Santana v. United States*, 88 F.R.D. 549 (D.P.R.1980), *Santana v. Collazo*, 89 F.R.D. 369 (D.P.R.,1981).

care, including lack of psychiatric and psychological services; (6) unsanitary conditions throughout the institutions; (7) lack of opportunities for physical exercise and recreation; and (8) that inadequately qualified and trained staff is responsible for the juvenile's rehabilitation. Plaintiffs seek declaratory relief to specify minimal constitutional standards for adequate rehabilitation of juveniles, and injunctive relief to rectify the alleged unconstitutional conditions, policies and practices. They also wish to enjoin Defendants from further admitting juveniles into these institutions until the constitutional standards which they claim are violated have been achieved.

The Complaint in Intervention of the United States was filed on November 29, 1976. It alleges that Defendants' acts and omissions are violative of the confined juveniles' rights under the Fourth, Fifth, Eighth, Ninth, Thirteenth and Fourteenth Amendments of the Constitution. It charges that: (1) juveniles with mental retardation, emotional disturbance and other handicaps are inappropriately placed in institutions which lack appropriate treatment services; (2) juveniles are placed in the Mayaguez or Maricao Camp without due consideration, development or operation of alternative community-based placements which are less restrictive in nature and conditions; (3) juveniles are denied the right to treatment and rehabilitative care, because of inadequate staff and facilities, lack of appropriate treatment and rehabilitative plans, and inhumane physical and psychological environment which fails to provide minimum standards of safety and health; (4) juveniles are subjected to extreme and unnecessary disciplinary measures, including prolonged solitary confinement and corporal punishment; (5) juveniles are forced to undergo excessive and/or nontherapeutic sedation by injection or ingestion of tranquilizing drugs; (6) juveniles are forced to perform nontherapeutic, institution-maintaining labor without financial compensation; and (7) juveniles are deprived of adequate and appropriate education, training and treatment services. Plaintiff-Intervenor requests a declaratory judgment and injunction against Defendants for failing or refusing to provide appropriate care and treatment in the least restrictive setting to all juveniles in their control or custody.

The intervening complaint's jurisdictional statement claims that this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1343(3) and that declaratory relief is authorized in accordance with 28 U.S.C. §§ 2201 and 2202. The Court granted intervention pursuant to the provisions of the Civil Rights of Institutionalized Persons Act, 42 U.S.C.A. § 1997 et seq. See 89 F.R.D. 369.

In synthesis, Defendants deny the allegations of Plaintiffs and Plaintiff-Intervenor.

After an extensive trial at which numerous witnesses testified, hundreds of exhibits were introduced, and various inspection tours were effectuated by the Court, we conclude that the truth lies somewhere between Plaintiffs' contentions to the effect that conditions at the juvenile facilities resemble the Black Hole of Calcutta and Defendants' version that they approximate a Hollywood version of Father Flanagan's Boys' Town.

Before coming to grips with these factual discrepancies, however, we must clarify certain legal concepts that permeate throughout this controversy.

## THE "RIGHT" TO TREATMENT

The principal basis relied upon by Plaintiffs and Intervenor in seeking equitable relief in this case is their alleged claim to a constitutional right to receiving minimally adequate care and treatment while in the custody of the Secretary of the Department of Social Services ("DSS"). Corollary to this contention is their claim to an alleged right to individualized treatment in the least restrictive environment.

These allegations bear some scrutiny.

Plaintiffs and Intervenor rely on the so-called *quid pro quo* or mutual compact theo-

rics[2] of juvenile justice, whereby it is reasoned that the state is bound to rehabilitate a delinquent youth as the *quid pro quo* to his having "bargained away" some of his constitutional rights in the less stringent and informal practices of the typical juvenile court proceeding. See *McRedmond v. Wilson*, 533 F.2d 757 (C.A. 2, 1976); *Nelson v. Heyne*, 355 F.Supp. 451 (N.D.Ind., 1972); aff'd 491 F.2d 352 (C.A. 7, 1974), *cert. den.* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *Morgan v. Sproat*, 432 F.Supp. 1130, 1135–37 (S.D.Miss., 1977); *Peña v. N.Y. State Div. for Youth*, 419 F.Supp. 203 (S.D. N.Y., 1976), *Morales v. Turman*, 383 F.Supp. 53, 70 (E.D.Tex., 1974), *rev'd on other gds.*, 535 F.2d 864 (C.A. 5, 1976), *rev'd and remanded for decision on merits*, 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977), *remanded*, 562 F.2d 993 (C.A. 5, 1977); *Martarella v. Kelley*, 349 F.Supp. 575 (S.D.N.Y., 1972); *Inmates Of Boys' Training School v. Affleck*, 346 F.Supp. 1354 (D.R.I., 1972); *Swansey v. Elrod*, 386 F.Supp. 1138 (N.D. Ill., 1975). These theories in turn rest on the "right to treatment" cases[3] which arose within the context of patients involuntarily committed to mental institutions. *Romeo v. Youngberg*, 644 F.2d 147 (C.A. 3, 1980), cert. granted 451 U.S. 982, 101 S.Ct. 2313, 68 L.Ed.2d 838 (1981); *Covington v. Harris*, 419 F.2d 617 (C.A.D.C.1969); *Goodman v. Parwatikar*, 570 F.2d 801 (C.A. 8, 1978); *Scott v. Plante*, 532 F.2d 939 (C.A. 3, 1976), 641 F.2d 117 (C.A. 3, 1981); *Rouse v. Cameron*, 373 F.2d 451 (C.A.D.C.1966).

It is obvious that these legal principals cannot be considered in a vacuum.

The DSS has custody of Plaintiffs in this case pursuant to the provisions of the so-called Minor's Law of Puerto Rico. 34 L.P. R.A. 2001 et seq. This Statute covers a wide range of matters dealing with minors,[4] among which are alleged violations of Commonwealth law or municipal ordinances, cases of incorrigible and neglected children, actions concerning the custody, tutorship (guardianship), waiver of *patria potestas* and adoption of children, and proceedings against the parents, tutors or others relating to encouraging child delinquency or neglect. 34 L.P.R.A. 2002. Jurisdiction is conferred on the Superior Court of Puerto Rico, who has administratively created a "Juvenile Division" to deal exclusively with these matters.[5]

In Puerto Rico the gaining of custody over a juvenile by DSS is at the end of a line of detailed procedural safeguards. After a complaint is filed, the judge orders a social worker to prepare a report of the social condition of the juvenile and of his family. 34 L.P.R.A. 2005. The investigation conducted at this stage, is aimed at enabling the judge to determine whether his intervention in the case is required, and in the case of a formal complaint, whether further proceedings are warranted. This study collects data concerning the minor, his general social adjustment, his personality, and his family background. The judge may waive jurisdiction and order that the juvenile be charged as an adult or may proceed to hear and decide the case under the juvenile law provisions. 34 L.P.R.A. 2004. No resolution or order of the Court, or evidence adduced against the minor before the juvenile court may be offered or admitted as evidence in any other civil or criminal case, or in any other judicial proceeding commenced against the juvenile. Id.

Although the right to bail does not exist for those children under custody (34 L.P. R.A. 2007(d)) there are several safeguards provided to children, not available to adults:

2. Ketcham, "The Unfulfilled Promise of the American Juvenile Court," in *Justice for the Child*, 22, 25–26 (M. Rosenheim ed. 1962).

3. And earlier arguments, see Birnbaum, "The Right to Treatment" 46 A.B.A. J. 499 (1960).

4. The law uses the term "child" which is defined as anyone under 18 years of age or who, having reached 18 years of age, is held to answer for an actual or attempted violation of law committed before reaching the age of 18 years. The terms "minor", "juvenile" and/or "child" shall be used indistinctively throughout this opinion.

5. See Méndez Gómez, "Realidades del Tribunal de Menores de Puerto Rico", 42 Rev.Jur. U.P.R. 481 (1973).

no fingerprints or photographs can be taken without judicial authority (34 L.P.R.A. 2007(e)); their records must be kept separately and are not available to the public (34 L.P.R.A. 2007(f); detention cannot be together with adults, nor can it be in a police station, jail or prison, nor can a minor be transported in a "paddy" wagon (34 L.P. R.A. 2007(c)).

■■ Adequate prior notice of all hearings must be given to the juvenile and his parents or custodian. The Court advises them of the right to representation by counsel and assigns counsel free of charge where necessary. The public is excluded from the courtroom, unless a request to the contrary is made by the minor. There are full rights of confrontation, cross-examination and presentation of evidence (including the use of the court's subpoena power) by the juvenile.

No proceeding against a minor is considered criminal in nature, nor can it entail the loss of civil rights resulting from conviction, nor can the minor be considered a criminal or convict for any reason. 34 L.P. R.A. 2011.

■ Notwithstanding the civil nature of the proceedings, the juvenile is entitled to a presumption of innocence, and the government is required to prove its case beyond a reasonable doubt in the case of any charge which would be considered a crime if it had been committed by an adult. *RAM v. Tribunal,* 102 D.P.R. 270 (1974). In fact, the right to trial by jury, which is not available in juvenile proceedings, is the only substantial right not available to a juvenile in Puerto Rico. *RAM v. Tribunal,* supra. Of course, in any event it has been long standing law, even if we may personally disagree with its basis,[6] that no one in Puerto Rico is *constitutionally* entitled to a jury trial in criminal cases. *Balzac v. Porto Rico,* 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922); *Montalvo v. Colón,* 377 F.Supp. 1332, 1336–1339 (D.P.R.1974) (three-judge Court).

The hearing may result in various alternative actions (34 L.P.R.A. 2010):

(1) The court may place the minor in a hospital or institution for the purpose of diagnosis by a physician, psychiatrist or psychologist,

(2) The court may set aside the petition for commitment to an institution,

(3) The court may place the minor on probation in the home of his parents or any other suitable person and under their custody or supervision,

(4) The court may place the minor under the custody of the Secretary of DSS "for commitment to an institution suitable for the treatment of children", or for placing in a foster home, or the court may provide the manner of the treatment, without the need of committing the minor,

(5) The court may place the juvenile under the custody of a suitable private organization or institution.

Where the juvenile is placed in the custody of DSS, the judge is required to transmit to the Secretary a summary of the information in his possession concerning the child and the Secretary must submit to the judge such periodical reports as the latter may at any time require about the physical, emotional and moral advancement of the minor. 34 L.P.R.A. 2012. Thus the judge retains jurisdiction over the committed minor *(Puerto Rico ex rel. N.I.R.M.,* Ref. Col. Abogados 93–1981) and may at any time modify any order or resolution, at his own initiative, or at the request of interested parties such as the Secretary, the minor's father, caretaker or custodian or the minor himself. 34 L.P.R.A. 2013. After a hearing at which all parties have a right to appear and present evidence, the court may take whatever action is deemed appropriate within the range of possibilities previously mentioned.

The actions of the Superior Court are appealable to the Supreme Court of Puerto Rico. 34 L.P.R.A. 2014.

Although the right to treatment is unquestionably a cognizable right pursuant to

---

**6.** See *Gautier Torres v. Mathews,* 426 F.Supp. 1106 (D.P.R., 1977).

the Constitution and laws of the Commonwealth (see P.R.Constitution, Art. VI, Sec. 19; 34 L.P.R.A. 2001 *et seq.*, "Statement of Motives" appearing at p. 505 of Law No. 97 of June 23, 1955; *Puerto Rico ex rel. N.I.R.M.*, supra), no allegation in either the Complaint or the Complaint in Intervention relies on said provisions as grounds for the present actions. We of course anticipate no opinion regarding the existence of possible pendent jurisdiction[7] as said allegation has never been an issue before this Court. It is clear however, that the present cases rely exclusively on 42 U.S.C. § 1983 and it is thus incumbent on Plaintiffs and Plaintiff-Intervenor to establish the right to treatment as a *federal constitutional or statutory right.* Neither Plaintiffs nor Plaintiff-Intervenor make any pretense at alleging said "right" by reason of any Federal statute.

■ We have considerable difficulty, notwithstanding the cases cited earlier in this opinion, with the proposition that such a right exists under the Constitution, and even if it does, we question whether its rationale has relevance to the juvenile justice system in Puerto Rico. Cf. Cortés García, "The Fallacy of the Gault Case", 32 Rev.Col.Abog. 141 (1971).

First of all, the *quid pro quo* argument is clearly inapplicable to Puerto Rico's system.

In the scheme of juvenile justice described above, it does not appear that juveniles in Puerto Rico have been placed in a position of having "bargained away" *any* constitutional rights versus adult offenders. With the exception previously indicated regarding jury trials, juveniles in Puerto Rico have all the rights of adults plus the substantial additional rights previously indicated which are not granted to the adult population. In other words the juvenile justice system of Puerto Rico places a juvenile defendant in a privileged position, not in one of constitutional disadvantage.

Secondly, given the continuing nature of the juvenile proceedings in Puerto Rico, wherein the judge prescribes the treatment

and retains jurisdiction for the multiple alternative actions previously indicated, we have serious doubts whether this Court can and/or should intervene through the use of its equitable powers in what amounts to a collateral attack to an on-going state proceeding. This is so particularly when the local law, which is the only one that creates the "right to treatment", also provides each plaintiff with an adequate structure for seeking individualized relief from the Superior Court Judge with jurisdiction over his case. Cf. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Huffman v. Pursue, Ltd.* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *Trainor v. Hernández*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); *Fernández v. Trías Monge*, 586 F.2d 848 (C.A. 1, 1978).

Lastly, we question the present validity of the right to treatment cases, particularly after Chief Justice Burger's concurring opinion in *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

*Rouse v. Cameron*, supra, is generally credited as the seminal case proclaiming a legal right to treatment for the involuntarily confined mentally ill. This habeas corpus proceeding held that a person involuntarily confined to a mental hospital, as a result of being acquitted of a criminal offense by reason of insanity, had a statutory right to treatment in the District of Columbia. Chief Judge Bazelon analyzed the facts in light of a then recently enacted civil commitment statute to find a right to treatment for Rouse. He then went further by noting *in dictum* that inadequate treatment for the involuntarily confined mentally ill also raised serious constitutional questions involving due process, equal protection, and Eighth Amendment prohibitions. *Rouse v. Cameron*, supra, 373 F.2d at page 453.

In *Creek v. Stone*, 379 F.2d 106 (C.A.D.C., 1967), this same court in a *per curiam* opinion inferentially granted a statutory right to treatment for involuntarily confined juveniles, in the District of Columbia.

---

7. Cf. *Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Thus, both *Rouse* and *Creek* were decided on statutory grounds.

Thereafter in 1968, the Supreme Judicial Court of Massachusetts in *Nason v. Superintendent of Bridgewater State Hospital*, 353 Mass. 604, 233 N.E.2d 908 (1968), recognized a constitutional right to treatment for the involuntarily confined mentally ill. The decision was based upon the observation that "[c]onfinement of mentally ill persons, not found guilty of crime, without affording them reasonable treatment... raises serious questions of deprivation of liberty without due process of law." 233 N.E.2d at 913. The court, however, failed to develop an analytical basis for this newly created right.

We then come upon *Wyatt v. Stickney*, 325 F.Supp. 781 (M.D.Ala., 1971), 334 F.Supp. 1341 (M.D.Ala., 1971), 344 F.Supp. 373 (M.D.Ala., 1972), aff'd in part, rev'd in part, rem. in part sub nom. *Wyatt v. Aderholt*, 503 F.2d 1305 (C.A. 5, 1974). This was a class action on behalf of patients at two state hospitals for the mentally ill and one for the mentally retarded. That court, relying primarily on *Rouse*, expressly held that civilly committed mental patients have a constitutional right to receive adequate treatment. 325 F.Supp. at 784, 785. The court's opinion was supported by defendants' acceptance of the standards formulated by the court.

*Inmates of Boys' Training School v. Affleck*, 346 F.Supp. 1354, 1364 (D.R.I., 1972), became the first case to recognize a constitutional right to treatment for involuntarily confined juveniles. Without expressly articulating a constitutional right to treatment, the court implicitly recognized such a right under the due process clause of the Fourteenth Amendment. It offered no analysis of the origins or parameters of the doctrine other than bare citation of *Wyatt*.

Thereafter, although several courts refused to acknowledge this new constitutional right (see *New York State Ass'n for Retarded Children, Inc. v. Rockefeller*, 357 F.Supp. 752 (E.D.N.Y., 1973); *Burnham v. Department of Public Health of State of Georgia*, 349 F.Supp. 1335 (N.D.Ga., 1972), rev. 503 F.2d 1319 (C.A. 5, 1974), cert. den. 422 U.S. 1057, 95 S.Ct. 2680, 45 L.Ed.2d 709 (1975)), various often-quoted cases were decided in favor of this new doctrine. See *Martarella v. Kelley*, 349 F.Supp. 575, 586, 600 (S.D.N.Y., 1972), 359 F.Supp. 478 (S.D.N.Y., 1973); *Nelson v. Heyne*, 355 F.Supp. 451 (N.D.Ind., 1972), aff'd 491 F.2d 352 (C.A. 7, 1974), cert. den. 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *Morales v. Turman*, 364 F.Supp. 166 (E.D.Tex., 1973), 383 F.Supp. 53 (E.D.Tenn., 1974), rev. and rem. 535 F.2d 864 (C.A. 5, 1976), rev. and rem. 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977), on rem. 562 F.2d 993 (C.A. 5, 1977), reh. den. 565 F.2d 1215 (C.A. 5, 1977).

Although initially this new right received an unusual amount of scholarly support (see references in Shepherd "Challenging the Rehabilitative Justification for Indeterminate Sentencing in the Juvenile Justice System: The Right to Punishment", 21 St. Louis U.S.J. 12, 22 n. 57 (1977)), it has also recently come under scholarly flack. See Levine, "Disaffirmance of the Right to Treatment Doctrine: A New Juncture in Juvenile Justice", 41 U. Pitt. L.Rev. 159 (1980); Note, "A Criticism of the Juvenile Offender's Right to Treatment", 26 Loyola Law Rev. 379 (1980). In his article, Levine states [8] that "[u]nquestionably, the recognition of a right to treatment for the mentally ill and then juveniles was a 'bootstrap operation' ", an analysis with which we fully agree.

The courts that have granted this constitutional right to involuntarily confined juveniles have used as a source the due process and equal protection clause of the Fourteenth Amendment and the Eighth Amendment prohibitions against cruel and unusual punishment. The due process basis has been held to include both procedural and substantive elements.

It is the procedural due process elements that first give rise to the *quid pro quo* doctrine. To our view, this doctrine has

8. At page 164.

come to an early demise with Chief Justice Burger's concurring opinion in *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1974). In that case a mentally ill patient was kept in confinement by the State of Florida for 15 years. He brought a suit for damages against the hospital staff alleging intentional and malicious deprivation of his constitutional right to liberty. The District Court granted instructions requested by plaintiff on the right to treatment, and the Court of Appeals affirmed these instructions and the resulting verdict against defendants, on the basis of the *quid pro quo* doctrine. 493 F.2d 507, at pages 519–527. The Supreme Court vacated and remanded.

The opinion of the Court upheld the finding that Plaintiff's right to liberty had been violated, but found that the Court of Appeals had not considered a defense of reliance on state law or the Court's ruling in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), then recently decided, on the issue of the scope of a state official's qualified immunity. The opinion of the Court states that "...there is no reason now to decide [in the present posture of the case] whether mentally ill persons dangerous to themselves or to others have a right to treatment upon compulsory confinement by the State..." 422 U.S. at 573, 95 S.Ct. at 2492. The Court's opinion gives no approval to the Court of Appeal's holding regarding a "constitutional" right to treatment and "makes clear that it binds neither the parties ... nor the courts of the Fifth Circuit" to such a ruling. 422 U.S. at 580, 95 S.Ct. at 2496 (Burger, C. J., concurring), also 577–578, n.12, 95 S.Ct. at 2494–95, n. 12 (Opinion).

Chief Justice Burger, in his concurrence, goes on to say that, "... in light of its importance for future litigation in this area, it should be emphasized that the Court of Appeals' analysis has no basis in the decisions of this Court." 422 U.S. at 580, 95 S.Ct. at 2496. Chief Justice Burger's comments are particularly relevant to the future of the *quid pro quo* doctrine:

"To the extent that this theory may be read to permit a State to confine an individual simply because it is willing to provide treatment, regardless of the subject's ability to function in society, it raises the gravest of constitutional problems, and I have no doubt the Court of Appeals would agree on this score. As a justification for a constitutional right to such treatment, the *quid pro quo* theory suffers from equally serious defects.

It is too well established to require extended discussion that due process is not an inflexible concept. Rather, its requirements are determined in particular instances by identifying and accommodating the interests of the individual and society. Where claims that the State is acting in the best interests of an individual are said to justify reduced procedural and substantive safeguards, this Court's decisions require that they be 'candidly appraised.' However, in so doing judges are not free to read their private notions of public policy or public health into the Constitution.

The *quid pro quo* theory is a sharp departure from, and cannot coexist with, due process principles. As an initial matter, the theory presupposes that essentially the same interests are involved in every situation where a State seeks to confine an individual; that assumption, however, is incorrect. It is elementary that the justification for the criminal process and the unique deprivation of liberty which it can impose requires that it be invoked only for commission of a specific offense prohibited by legislative enactment. But it would be incongruous, for example, to apply the same limitation when quarantine is imposed by the State to protect the public from a highly communicable disease.

A more troublesome feature of the *quid pro quo* theory is that it would elevate a concern for essentially procedural safeguards into a new substantive constitutional right. Rather than inquiring whether strict standards of proof or periodic redetermination of a patient's condition are required in civil confinement, the

theory accepts the absence of such safeguards but insists that the State provide benefits which, in the view of a court, are adequate 'compensation' for confinement. In light of the wide divergence of medical opinion regarding the diagnosis of and proper therapy for mental abnormalities, that prospect is especially troubling in this area and cannot be squared with the principle that 'courts may not substitute for the judgments of legislators their own understanding of the public welfare, but must instead concern themselves with the validity under the Constitution of the methods which the legislature has selected.' Of course, questions regarding the adequacy of procedure and the power of a State to continue particular confinements are ultimately for the courts, aided by expert opinion to the extent that it is found helpful. But I am not persuaded that we should abandon the traditional limitations on the scope of judicial review.

In sum, I cannot accept the reasoning of the Court of Appeals and can discern no basis for equating an involuntarily committed mental patient's unquestioned constitutional right not to be confined without due process of law with a constitutional right to *treatment.* Given the present state of medical knowledge regarding abnormal human behavior and its treatment, few things would be more fraught with peril than to irrevocably condition a State's power to protect the mentally ill upon the providing of 'such treatment as will give [them] a realistic opportunity to be cured.' Nor can I accept the theory that a State may lawfully confine an individual thought to need treatment and justify that deprivation of liberty solely by providing some treatment. Our concepts of due process would not tolerate such a 'tradeoff.' Because the Court of Appeals' analysis could be read as authorizing those results, it should not be followed." 422 U.S. at 585–589, 95 S.Ct. at 2498–2500. (Emphasis in original, citations and footnotes omitted).

As can be seen, the Chief Justice's opinion also takes a dim view of the substantive due process arguments. Under the substantive theory, when the state seeks to exercise its *parens patriae* power to involuntarily confine juveniles and the mentally ill, it must first fulfill its parental role by providing treatment. The Court of Appeals thus held that a "nontrivial governmental abridgement of freedom must be justified in terms of some 'permissible governmental goal.'" 493 F.2d at 520. It found that involuntary civil commitment could only be justified by the need for treatment, in which case due process required minimally adequate treatment to be provided. Relying on *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972), the Court of Appeals reasoned that if the purpose of commitment was treatment, and treatment was not provided, the nature of the commitment failed to bear reasonable relation to its purpose, and thus *Jackson* was violated.

In terms of the juvenile proceedings, procedural due process goes to the adjudicative process, how the confinement came about, while the substantive due process argument depends on the later disposition of the juvenile, the reason for the confinement.

The *O'Connor* case removes the underpinnings of both the procedural and substantive due process arguments to the alleged right to treatment theory. The Court of Appeals for the Fifth Circuit, the prime proponent of this "right" prior to the Supreme Court decision in *O'Connor*, so interprets *O'Connor* as we see from its second *Morales* appeal. (562 F.2d 993, 997–999 (C.A. 5, 1977)). In that case, which involves right to treatment allegations vis-a-vis juvenile offenders, on the basis of the intervening *O'Connor* ruling the Court of Appeals abandons its prior support of the right to treatment doctrine, and decides that only the Eighth Amendment's cruel and unusual standards are available to scrutinize the conditions of juvenile detainment.

Before discussing the Eighth Amendment argument, we note that Plaintiffs' equal protection contentions originally made in

their Complaint, were not followed up in their briefs. We assume this is not an oversight. One of the few cases which relies on the equal protection clause as a basis for the right to treatment[9] was *Halderman v. Pennhurst State School and Hospital*, 446 F.Supp. 1295 (E.D.Pa., 1977), *aff. in part on other grounds*, 612 F.2d 84 (C.A. 3, 1979), *rev'd on other grounds*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). The District Court seems to have based that ruling on a finding that the mentally retarded patients, who were the plaintiffs in that case, were a "suspect class" for constitutional purposes, a proposition which causes us no small degree of difficulty and which we could not, in any event, apply to Plaintiffs' class. The Court of Appeals avoided the constitutional basis of the lower ruling, inferring instead the creation of a private cause of action in the so-called Bill of Rights provisions of the Developmentally Disabled Assistance Act, 42 U.S.C. § 6010 *et seq.* That court found that plaintiffs were statutorily entitled, under both state and federal law to habilitation in the least restrictive environment. 612 F.2d at 115. Although the Court of Appeals in substance affirmed the remedial order, it did not require the closing of the institution, and in its place remanded for "individual determinations . . . as to the appropriateness of an improved Pennhurst for each patient" . . . with instructions that it "engage in a presumption in favor of placing individuals in [community living arrangements]." Id., at 114–115.

The Court, in finding that Section 6010 did not create enforceable rights and obligations through individual causes of action held:

"...[W]e find nothing in the Act or its legislative history to suggest that Congress intended to require the States to assume the high cost of providing 'appro-priate treatment' in the 'least restrictive environment' to their mentally retarded citizens.

There is virtually no support for the lower court's conclusion that Congress created rights and obligations pursuant to its power to enforce the Fourteenth Amendment. The Act nowhere states that that is its purpose...Nothing in either the 'overall' or 'specific' purposes of the Act reveals an intent to require the State to fund *new* substantive rights..." (at page 14 of slip opinion; emphasis supplied).

Further commenting on aspects of the opinion of the Court of Appeals, the Court states, at page 21 of the slip opinion:

"...It is difficult to know what is meant by providing 'appropriate treatment' in the 'least restrictive' setting and it is unlikely that a State would have accepted federal funds had it known it would be bound to provide such treatment..."

In conclusion the Court says:

"...The Developmentally Disabled Assistance and Bill of Rights Act... establishes a national policy to provide better care and treatment to the retarded and creates funding incentives to induce the states to do so. But the Act does no more than that. We would be attributing far too much to Congress if we held that it requires the States, at their own expense, to provide certain kinds of treatment. Accordingly, we reverse the principal holding of the Court of Appeals and remand for further proceedings consistent with this opinion."

The case is still under consideration before the Court of Appeals on the constitutional basis of the District Court's opinion.[10]

---

9. Although the District Court in *Pennhurst* uses the term "habilitation", it is used interchangeably with "treatment." See page 3, 101 S.Ct. page 1533 footnote, of the Supreme Court opinion.

10. A year after its decision in *Halderman v. Pennhurst State School and Hospital*, 612 F.2d 84, the Court of Appeals for the Third Circuit entered its opinion in *Romeo v. Youngberg*, 644

F.2d 147 (3rd Cir., 1980), *cert. granted* 451 U.S. 982, 101 S.Ct. 2313, 68 L.Ed.2d 838 (1981), also involving a mentally retarded committed at Pennhurst State School and Hospital. The plaintiffs in *Romeo* brought their suit under 42 U.S.C. Sec. 1983 seeking compensatory and punitive damages. It was alleged that Romeo had been kept shackled to a bed or chair for

■ Various courts seem to have granted juveniles a right to treatment based on the right to protection from harm as encompassed within the Eighth Amendment's proscription against cruel and unusual punishment. *Nelson v. Heyne*, supra, 491 F.2d at 356; *Inmates of Boys' Training School v. Affleck*, supra, 346 F.Supp. at page 1366; *Martarella v. Kelly*, supra, 349 F.Supp. at page 599; *Morales v. Turman*, supra, 383 F.Supp. at 77. We disagree with that conclusion in so far as it implies a so-called "right to treatment." The Cruel and Unusual Punishment Clause, where applicable, (1) limits the kinds of punishment that can be imposed on those convicted of crimes (*Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 596 (1958)), (2) proscribes punishment grossly disproportionate to the severity of the crime (*Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910)), and (3) imposes substantive limits on what can be made criminal and punished as such (*Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962)). We fail to see a basis within said confines for the creation of a "right to treatment."

■ The Supreme Court has not decided whether the Eighth Amendment is applicable to test conditions of juvenile institutions. There are some strong indications, however, to the effect that under certain circumstances it will apply to them.

In *Ingraham v. Wright*, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977), the Court held that the Eighth Amendment was inapplicable to corporal punishment of school children, and instead analyzed said punishment from the viewpoint of the Fourteenth Amendment's right to be free from unjustified intrusions on personal liberty. The Court specifically left open whether the Eighth Amendment was applicable to juvenile institutions. 430 U.S. at 669 n. 37, 97 S.Ct. at 1411 n. 37. In so holding the Court said:

> "Some punishments, though not labeled 'criminal' by the State, may be sufficiently analogous to criminal punishments in the circumstances in which they are administered to justify application of the Eighth Amendment. Cf. *In Re Gault*, 387 U.S. 1 [87 S.Ct. 1428, 18 L.Ed.2d 527] (1967)." *Id.*

In that case, of course, the Court in refusing to apply the Eighth Amendment was comparing "the prisoner and the school child ... in wholly different circumstances, separated by the harsh facts of criminal conviction and incarceration." 430 U.S. at 669, 97 S.Ct. at 1411. In our view, for purposes of determining Eighth Amendment coverage, the conditions whereby juveniles are detained in Puerto Rico are "sufficiently analogous" to criminal punishment to allow application of said constitutional provision.

Thus, while rejecting the existence of a constitutional right to treatment, we adopt

long periods each day, that he had received injuries, both self-inflicted and caused by other residents of the institution, and that he had received inadequate treatment, protection and medical attention. The Court of Appeals found the District Court's reliance on the Eighth Amendment misplaced. It considered that the Cruel and Unusual Punishment provision is inapplicable "in the context of civil as distinguished from criminal confinement[.]" 644 F.2d at 156. The Court of Appeals then addressed the alleged violations to the Fourteenth Amendment. It found that "[i]nvoluntary commitment in the civil context, ... quite clearly implicates a constitutional right to treatment and protection." *Id.* at 158 (footnotes omitted). The Court of Appeals then stated that the treatment the state is constitutionally required to provide is "a form of treatment that is regarded

as acceptable ... in light of present medical or other scientific knowledge." 644 F.2d at 169 (footnotes omitted). When the Court of Appeals entered its opinion in *Romeo v. Youngberg*, supra, the Supreme Court had not yet issued its decision in *Pennhurst State School v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). The Supreme Court subsequently granted certiorari in *Romeo*; the case was argued already and it is pending a decision.

*Romeo*, in any event, is clearly distinguishable from the case at bar in that it involves an institution for retarded persons whereas in the case at bar we are dealing with juvenile institutions, a completely different setting particularly when we consider the observations regarding Puerto Rican substantive law.

the Fifth Circuit's revised viewing of the problem, as stated in its second decision in *Morales v. Turman,* supra 562 F.2d at 998–999:

> "While a right to treatment is doubtful, any constitutional abuses that may be found in the .... juvenile program can be corrected without embracing such doctrine in this case. The eighth amendment prohibition of cruel and unusual punishment as the constitutional standard for conditions of imprisonment can adequately remedy conditions in ... institutions. For instance, the physical abuse of the students and degrading work assignments could be eliminated as cruel and unusual without adopting the questionable doctrine of a right to treatment. Admittedly, the eighth amendment will not require the state to provide extensive vocational training, detailed personality assessments or coeducational facilities. The choice of providing these services properly remains with the State ... herein." (footnotes omitted).

Our inquiry is thus limited to determining whether the conditions at Mayaguez and Maricao in any way contravene the Eighth Amendment or the due process clause of the Fourteenth Amendment. Cf. *Martínez Rodríguez v. Jiménez,* 409 F.Supp. 582 (D.P.R., 1976) aff'd 537 F.2d 1 (1976). In so restricting the ambit of this case, we of course, are not passing judgment or expressing an opinion on matters outside the scope of what is constitutionally required. Irrespective of any personal feelings that this Court may have regarding possible alternatives to problems and situations encountered during the course of this trial, it should be kept in mind that Federal Courts are tribunals of limited jurisdiction, and that matters such as the wholesale reform of the juvenile justice system are not within its competence or expertise.

We thus look at the evidence with these limitations in mind.

## FINDINGS OF FACT

INTRODUCTION:

1. The Plaintiff class is composed of all juveniles who have been, will be or presently are incarcerated in the juvenile correctional facilities at Mayaguez and Maricao.

2. Within this Plaintiff class there are juveniles who have been adjudicated guilty of delinquent acts, juveniles who have been adjudicated guilty of status offending behavior, nonoffender juveniles who have been placed in the custody of the defendants, juveniles who have not been adjudicated guilty of any act and who are merely awaiting trial, juveniles who have run away from previous institutional placements (including institutions that allegedly incarcerate only status offenders) and juveniles who have been transferred to Mayaguez or Maricao from other juvenile institutions.

3. The DSS is a governmental agency of the Commonwealth of Puerto Rico operating a system of Social Treatment Centers and other facilities where juveniles placed under the custody of the DSS are assigned.

4. In the organizational structure of the Commonwealth of Puerto Rico, the Secretary of the DSS as a Cabinet member, is responsible directly to the Governor of Puerto Rico.

5. The system operated by the DSS is in itself a last resort utilized by the Juvenile Courts of the Commonwealth of Puerto Rico when other non-departmental alternatives have been exhausted or otherwise deemed inadequate by the Court. Aside from assigning the custody of a juvenile to the Secretary, the Juvenile Courts often utilize less restrictive alternatives provided both by private and public organizations.

6. The determination to place a given juvenile under the custody of DSS is based on a number of factors, amongst which are the following: the nature of the offense, the number of prior offenses committed by the juvenile, the nature of the controls that the juvenile needs according to the psychologists, social workers, and other professionals who make reports to the Juvenile Court on these matters, the characteristics of the home and of the immediate social environment of the juvenile, and other similar considerations.

7. While a juvenile is still in the process of having complaints against him adjudicated by the Juvenile Court, a number of evaluative services are provided. These services include a case study by a social worker, psychological evaluations and, when deemed necessary, psychiatric evaluations, neurological evaluations, encephalograms, and other similar tests. The results of these studies, tests and evaluations are available for consideration by DSS.

8. It frequently happens that before a juvenile is placed under the custody of the DSS he has already spent some time in one or more of the non-institutional community-based alternatives utilized by the Juvenile Courts.

9. Once DSS gains custody over a minor a decision is made regarding placement within the system. The following are the factors usually taken into consideration: the nature of the offense or offenses committed by the juvenile; his case history both at his home, community, and during any prior experience within DSS or while placed in a non-departmental alternative; psychological evaluations; the degree of controls and services provided at each of the different alternatives operated by DSS. The DSS has an Admission and Discharge Unit that is responsible for the placement of the juvenile in a specific institution or other alternative. When the juvenile has been on detention status within one of DSS's institutions, pending adjudication of a complaint against him by the Juvenile Court, the original decision of placement within one of the units operated by DSS is made by a treatment committee that has examined and discussed the case of the juvenile at the detention center itself. DSS has authority to transfer institutionalized juveniles, including those at Mayaguez, to group homes and other community-based alternatives without court approval. In addition, DSS can petition the juvenile court for discharge at any time or for any of the various other remedies available.

10. The Social Treatment Center Bureau operates three detention, evaluation and diagnostic homes and seven social treatment centers providing services to juveniles. The detention, evaluation and diagnostic homes are the following: the Hato Rey Juvenile Home, the Ponce Juvenile Home and the Humacao Juvenile Home. The social treatment centers are the following: the Maricao Youth Camp ("Maricao"), the Aibonito Social Treatment Center for Girls, the Ponce Social Treatment Center for Boys, the Trujillo Alto State Home for Girls, the Guaynabo State Home for Boys, the Ponce Industrial School for Girls and the Mayaguez Industrial School for Boys ("Mayaguez").

11. In addition to the Social Treatment Centers, DSS operates or contracts facilities that also provide custodial services to juveniles in settings within the communities, such as group homes and foster parents homes, which are less restrictive than the social treatment centers. There are presently six group homes in operation: three in Río Piedras, two in Ponce and one in San Germán.

12. In addition to the direct custodial services provided by the Social Treatment Center Bureau of DSS, other Bureaus in the DSS provide services that are also integrated with those provided by the Social Treatment Centers Bureau:

The Vocational Rehabilitation Bureau provides the juveniles with a program of workshops that trains the juveniles in skills such as ceramics, iron works, auto repair, tailoring, carpentry, plumbing and barber skills.

The Family Services Bureau provides services within the community to families in need of different kinds of social assistance. Many of the juveniles placed under the custody of DSS come from such families and in those instances the efforts of the Social Treatment Center Bureau and the Family Services Bureau include assistance in dealing with the problems of the juveniles. This is normally achieved through the intervention of the local offices that DSS operates throughout the Commonwealth of Puerto Rico.

The Public Assistance Bureau provides economic assistance to many of the families

of the juveniles placed under the custody of DSS.

13. The system of Social Treatment Centers and other institutions operated by the Department is organized in such a manner as to provide different degrees of control and rehabilitative services.

## MAYAGUEZ

*Introduction*

14. Mayaguez is the maximum security institution within the DSS system wherein juveniles in need for the tightest controls are placed.

15. In the large majority of cases, the juveniles assigned to Mayaguez have spent some time in other less restrictive alternatives within the system operated by DSS and have displayed behavioral problems making those alternatives inadequate. Among the behavioral problems often found in these juveniles the most common are escapes and involvement in incidents of violence within the institutions.

16. In the large majority of cases, in addition to the behavioral problems described in the preceding paragraph, it is found that the juveniles assigned to Mayaguez have incurred in acts which, if committed by an adult, would be classified as felonies.

17. The criteria used by DSS to place juveniles in Mayaguez are reasonable and properly related to the decisional process involved.

18. The Mayaguez population has ranged from a low of 67 to a high of 158 during the period 1977–1981. On October 1, 1977, there were 142 juveniles on the rolls: 92 physically present; 12 on pass; 38 escapees. On April 10, 1981, there were 100 juveniles at Mayaguez. The capacity of the institution is 138.

19. Juveniles have spent as long as six or seven years at Mayaguez. Currently, one juvenile has been at Mayaguez for over 3 years; 6 have been there for over one year. Most juveniles are discharged by age 18, though some may stay until they are 21. The average age of the population is approximately 16 years old.

20. The average length of stay at Mayaguez of juveniles released in 1978–79 was 10.7 months; in 1977–78, 13.2 months and from July-October 1977, 17 months.

21. The average yearly cost of incarcerating a juvenile at the Mayaguez facility was approximately $12,000 during 1977 and 1978 and is estimated today to be $15,000 a year per child.

22. Although, at some point after the initiation of the present case, it was the practice at Mayaguez to keep there a variable number of status offenders, as a result of a change in the policy of DSS having to do with the availability of federal funds through the Puerto Rico Crime Commission, and also as a result of a recent law approved by the Legislature of Puerto Rico, the practice of keeping status offenders at Mayaguez has been discontinued.

23. The juveniles at Mayaguez, like those found in similar institutions elsewhere, present multiple problems. Many have substantial learning problems due to emotional disturbances, others suffer from mental retardation, and yet others from mental or physical handicaps. Many have low self-esteem syndromes and have difficulty coping with stress and frustration. There are thus four basic groups of juveniles at Mayaguez: mentally retarded juveniles, psychiatrically ill juveniles, those with minor psychological problems and serious social difficulties, and serious offenders. The first three groups comprise the majority of the population; mentally retarded juveniles are the most numerous. The group with mental retardation clearly represents a major proportion of the Mayaguez population and this group covers the range from severe to mild retardation. Severely retarded juveniles have been admitted to the institution in contravention of the Mayaguez admissions criteria. Severely emotionally disturbed juveniles have also been inappropriately admitted. Severely mentally retarded and emotionally disturbed juveniles should not be at Mayaguez.

24. The institution has also had epileptic juveniles in its population. Defendants ad-

mit that Mayaguez is an inappropriate place for these juveniles. They also admit that it is inappropriate for status offenders. At times, Mayaguez has pre-trial detainees, despite a clear DSS policy prohibiting their placement at the institution. Defendants' efforts to advise juvenile courts of the inappropriateness of sending pre-trial detainees to Mayaguez have proven unsuccessful. Pre-trial detainees often spend long periods in the institution and in all cases are confined to isolation without access to any of the institution's programs.

*Physical Facilities*

25. Mayaguez consists of a series of buildings located on fifty acres of land in a peninsula south of the city of Mayaguez. It is approximately fifteen minutes drive from the city center. The main structures overlook the ocean and are surrounded by trees and open fields. They consist of a central administrative building which is comprised of an auditorium, the medical and dental areas, and the ceramics workshop; the residential area containing three dormitories and the dining room; the so-called intensive care or "isolation" unit complex; the school building, wherein are located the academic classrooms and library; a so-called recreational building; and the workshop building with its related workshop and vocational training facilities.

26. The aforementioned administrative area is located in an old, Spanish-style building, constructed at the beginning of the century. Although, structurally the building is in rundown condition, most of the rooms and offices are spacious, with walls recently painted and a ceiling, which because of its height creates considerable cross ventilation.

As indicated, there is an auditorium in which the general membership of the juveniles meet on a daily basis as well as for special activities. Although adequate in terms of ventilation and size, the lighting and the general condition of this area are greatly deteriorated and in need of paint and repair.

Also located in the administrative building is a ceramic shop, which is one of the shops operated as part of the vocational training program of the school. The ceramic shop contains adequate work material. Its location and general physical condition is clean and cool. From the observation of the court during a viewing of this facility, both in terms of general appearance of the shop, in terms of the number of both finished and in-process projects observed by the court at the shop, of the general atmosphere observed while a number of juveniles were participating in the program and of the description offered the court by the person in charge of the shop, the Court concludes that the ceramic shop at Mayaguez is offering the juveniles an active program which is beneficial to the rehabilitation of the juveniles participating therein.

This building also contains, in addition to the office of the Director, and offices for other administrative services, the social workers' unit, where the different social workers and social work technicians have their offices and interview juveniles; the psychiatrist's office; and the medical unit of the institution.[11]

27. The construction of the buildings wherein the residential facilities are located was finished during the year 1975, but their inauguration was delayed because of a number of defects in the plumbing system. It was not until approximately 1977 that these defects were corrected and the facilities were finally inaugurated.

There are three residential buildings identified as A, B, and C. Buildings A and B are divided into two sections: each section contains four dormitories. Buildings A and B each has two day-rooms and one bathroom area each with four toilets and four showers. Building C is divided into two sections with each section containing 7 dormitories.

These buildings are maximum security physical structures. Dorms A, B and C are separated from the inner courtyard by a 15 foot chain-link fence topped with barbed

11. Medical and dental services and facilities will be covered separately.

wire. A similarly constructed fence surrounds the outside perimeter of the dorms. The dormitory interiors are also maximum security in nature: they have padlocked doors, barred windows and are set up to allow for extensive surveillance of the juveniles.

The inside of each of the dormitory buildings although spartan, is clean, adequately painted and has good cross ventilation. The bathrooms, toilets and showers at each of the dormitories described were clean, although several of these facilities were in need of various stages of repair. Within each of the dormitory areas, the beds are organized in a military-like fashion, with adequate separation between beds, in a generally spacious area with high ceilings that contribute to a feeling of coolness and spaciousness. At different points throughout the dormitory area there are lockers wherein the juveniles keep personal items such as clothing and toilet articles. The only furnishings, other than the beds or cots, were some wrought iron furniture in the dayrooms. Decoration was non-existent, consisting solely of some paste ups. Beds were made up with clean sheets. Some of the mattresses, most of which were of polyurethane plastic, were in deteriorated condition. There was no screening in the windows or doors of the residential units.

28. The living space assigned to each juvenile at Mayaguez, in terms of general environmental quality of the area, moving space, lighting, temperature and other similar factors, although spartan is adequate and compares satisfactorily with the general living conditions of the majority of the people of the Commonwealth of Puerto Rico, taking into consideration of course, the secure nature of the Mayaguez environment.

29. The security controls have been insufficient to prevent a high rate of escapes. As of April 1, 1981, 19 out of a total enrollment of 117 at Mayaguez, or 16%, were escapees.

30. The courtyard formed by the residential buildings, which is a square of approximately one acre in area, contains a basketball court.

31. The building in which the dining room is located is a modern, well painted, reinforced concrete building on the west side of the courtyard. The dining area is clean, well ventilated and the tables and chairs are in good condition. The food trays, silverware and china are also in adequate condition and clean.

The kitchen area, which is in the back part of the dining room, is also generally spacious, clean and cool. Both the kitchen and the dining areas have screens on all doors and windows and appear to be free from flies or other insects. The equipment is modern, mostly stainless steel topping and hardware, and appeared to be generally appropriate.

The equipment and the procedures followed at the dining room and kitchen at Mayaguez for cleaning and washing silverware, plates, trays, and other equipment and tools, are satisfactory and compare favorably with the standards that may be found under similar circumstances in private or public institutions throughout the Commonwealth of Puerto Rico.

The Court is not aware of any case of food poisoning or of a juvenile acquiring any illness as a result of eating the food served at the Mayaguez dining room.

A current certificate from the Department of Health was posted at the kitchen, evidencing that an inspection by the Department of Health of the Commonwealth of Puerto Rico had been recently passed.

32. The storeroom, located adjacent to the kitchen, is used for storing the necessary items for the foodstuffs to be consumed in the immediate future. It was also clean and well ventilated. The food stored there, which is principally fresh-vegetables or canned food, was appropriately in an orderly manner.

The main warehouse was well stocked with dry foods, was clean and cool, and the materials where stocked in an orderly manner. The warehouse had a general appearance of spaciousness and coolness.

33. The food service activity at Mayaguez both in terms of the quality of the food, the balancing of the diet, the cleanliness and hygiene at the dining and kitchen facilities, and in terms of the quantity of food offered the juveniles and the nutritional value of the same, is adequate and appears to be typical Puerto Rican food.

34. The intensive care unit complex at Mayaguez, which is also referred to as the "isolation" or "disciplinary" unit, is a separate concrete building located approximately fifty yards from the quadrangle where the regular dormitories are located. It is also quadrangular in shape, and is surrounded by a ten foot high chain-link fence, topped with barbed wire. The building is made of reinforced concrete, with an interior courtyard. The cells face inward and are approximately nine feet by nine feet square in size. They contain one bed, a toilet facility and a window facing the outside of the building. The window and the door are barred. The ceiling is ten to twelve feet high. The cells themselves are clean but bare, except for a wood slab with a foam mattress covered by a sheet, and a wash basin and toilet. Cross ventilation offers adequate ventilation. Neither the door nor windows are screened.

35. The school area, where the academic instruction of the juveniles takes place, is in a separate building used only for that purpose. This building is constructed of plywood and construction cardboard. It is clean, well lit, modern and well painted. The individual classrooms are all air conditioned. There are no bars in any of the doors or windows. The average size of the classroom, other than the tutorial classrooms is large enough to comfortably accommodate approximately fourteen student seats. The tutorial classrooms accommodate approximately four to six seats each. Additionally, there is a special education classroom which accommodates approximately eight seats. There is an area where audiovisual material is prepared. There is a separate classroom for each subject matter taught in the academic program. Each of the classrooms contains adequate materials and books and generally good equipment.

The classrooms and their materials and equipment compare favorably with those found for similar subjects and grades in the public school system of the Commonwealth of Puerto Rico. Furthermore, they compare satisfactorily with the average *private* school in the Commonwealth of Puerto Rico, both in terms of atmosphere and in terms of the equipment and facilities available for the students.

36. In terms of physical appearance, equipment available and general atmosphere, the academic area, in general, presents a highly favorable impression.

37. The vocational education workshops are located in a separate reinforced concrete building which is modern, well painted, clean and with more than adequate cross ventilation, creating generally a cool and airy atmosphere in the inside. The workshop building does not contain any bars in any of the windows or doors.

There is at the workshop building a carpentry shop, which is well equipped with different kinds of tools and equipment adequate for the purpose of providing training to the juveniles. The workshop building also contains a barber shop where the barbering arts are taught, which is well equipped with modern-looking barber chairs, tables and similar equipment, and which presents an appropriate atmosphere and appears to be actively used by the juveniles.

The workshop building also contains an upholstery shop which contains equipment appropriate for training in upholstery and which also was clean-looking, airy and cool and in general terms adequate to the purposes of training in upholstery.

There are also a tailoring shop, an iron workshop and an auto repair shop. These shops, like the ones already described, were also clean looking, airy and cool and contain equipment related to the specific workshop involved, and have a general appearance of being modern, clear and in good working condition.

38. The general impression caused by the workshop building, in terms of each of

the workshops described and in general, was highly favorable. The tools, equipment, and general atmosphere of each of the workshops at the vocational workshop building compare favorably with those of the public school system of the Commonwealth of Puerto Rico as well as with those private schools in Puerto Rico which operate vocational training programs.

39. The recreation building is located between the main administration building and the workshop area. It is an old, dilapidated structure consisting of two wings, one of which contains various recreational equipment, and the other the plumbing workshop. Although it has adequate ventilation, it is dirty in appearance and in a general state of disrepair. The windows and doors are all barred.

40. A number of fire extinguishers in use throughout Mayaguez were not properly maintained in operational order, it appearing that they were not adequately charged. Once this situation is corrected the Court is not aware of other fire safety hazard at the Mayaguez, other than the polyurethane mattresses.

*The Staff*

41. The organization of Mayaguez is as follows: There is a Director, with the maximum executive and administrative authority within the school, an Assistant Director who responds directly to the Director; an administrative component; a social work component; a medical component; an educational component; a personnel component; a psychiatric component and a psychology component. The administrative component includes the nutritional services, the warehousing and storage, the laundry shop, the clothing shop, the transportation shop, and the maintenance and conservation shop. The social work component includes both social workers and social work technicians. The medical component includes a doctor, a registered nurse, a practical nurse, and a dentist. The educational component includes an academic education section and a vocational education section. There is a vocational education director, and an academic education director. There is also a physical education component with its own director. The academic education program has, in addition to its director, teachers and assistants, and tutors. The vocational education program, in addition to its director, has teachers and assistants, each assigned to his particular field of work.

42. The medical personnel available at Mayaguez consists of one full-time registered nurse who works Monday through Saturday except on Thursday, a full-time practical nurse who works Monday through Friday, a half-time medical doctor, a half-time dentist, and a psychiatrist working from forty-eight to fifty hours monthly. This later position, although filled at the time the complaints were filed, had been vacant for several months at the time of trial. A psychologist works part-time at Mayaguez, serving forty-two hours a month. The psychologist participates in the administration of tests, in making interviews with the juveniles, in training the social workers and social work technicians on therapeutic techniques and in offering selective therapeutic sessions to juveniles. The psychologist is also often present at the weekly meetings of the Treatment Committee.

In addition to the medical, psychiatric and psychological services provided at Mayaguez, arrangements exist to have complementary services provided, as in fact they are provided when needed, by medical facilities in Mayaguez or elsewhere operated by the Commonwealth's Department of Health. Also, psychiatric and psychological evaluation and other services are provided by the Evaluation and Diagnosis Center operated by the DSS in San Juan, as well as by other professionals in these fields, with whom arrangements exist to provide such service as may be requested by the institution when needed. It is the conclusion of the Court that with respect to such medical, psychiatric and psychological services that may be needed, in addition to those provided at Mayaguez, the institution has adequate arrangements.

43. The residential unit component in Mayaguez is responsible for the operation of the different residential facilities operated at the school.

There are approximately sixty five to sixty nine "encargados" and seven supervisors at Mayaguez, divided into three shifts. Each of the three shifts of "encargados" functions with approximately the same number of "encargados" and supervisors. They are in charge of the direct custody of the juveniles during their daily activities. The responsibilities of an "encargado" include the administration of the juvenile residences, providing house-life-services, accompanying the juveniles to their meals and to special services such as medical services or psychological evaluations, taking them to their interviews with the social workers, assisting the juveniles in emergency situations, accompanying them to picnics or other outside activities, and accompanying them during the recreational activities inside or outside the institution and other similar custodial services.

44. Currently, Mayaguez has five social workers and five social work technicians. The workload of cases assigned to each social worker or social work technician at Mayaguez is adequate and compares favorably with the workload of a typical social worker in other private and public institutions throughout the Commonwealth of Puerto Rico.

45. There are five academic teachers in the general academic education program, two special tutorial teachers in the general academic program, and eight vocational teachers at Mayaguez.

46. The Director at Mayaguez has a Bachelor's Degree on Social Science and is currently studying towards a Master's Degree on criminal justice. All the social work technicians working at Mayaguez have a Bachelor's Degree, three of them have a Bachelor's Degree with a major in social work; one has a Master's Degree in social work.

The training offered to social work technicians and social workers, as well as to new social work supervisors at Mayaguez is adequate and compares satisfactorily with the standards for the profession of social worker prevailing throughout the Commonwealth of Puerto Rico.

All of the teachers at both the academic education program and the vocational education program are licensed and authorized to teach in Puerto Rico by the Department of Education of the Commonwealth of Puerto Rico.

The "encargados" at Mayaguez have at least a high school diploma.

The training program in effect at the DSS for introductory and on-the-job training of the different members of the staff at Mayaguez is adequate in reaching and maintaining a satisfactory level of efficiency in the performance and compliance of the mission of the School.

47. The academic preparation and experience requirements in effect for the different members of the staff and for other employees at Mayaguez, including the Director, the social workers supervisor, the social workers, the social work technicians, the "encargados", the psychiatrist, the medical doctor, the dentist, the registered nurse, the practical nurse, the school principal, the school teachers, the workshop teachers, and other dealing directly with the juveniles, are adequate and compare satisfactorily with the academic requirements and requirements of experience in effect throughout the Commonwealth of Puerto Rico for similar areas of service and professional expertise.

*Programs*

48. When the juveniles arrive at Mayaguez Industrial School, they are given a number of evaluative tests including psychological test, achievement test, intelligence test and other measurements directed to determine the specific needs of each individual. The results of these tests and evaluations are studied in conjunction with other evaluations, examinations and measurements that may have been administered to the juveniles prior to his arrival to develop criteria for the specific rehabilitation plan of the juvenile.

These tests are also used for designing their academic education and vocational education programs and their special treatment programs, where needed.

49. For the purposes of assigning juveniles to the different residential units, Mayaguez takes into account mostly age and size, but also the relative aggressiveness of the juvenile and his ability to defend himself from others.

50. Juveniles identified as having problems with drug addiction are assigned to the SEMIT program, which is a program administered by the Commonwealth's Department Against Drug Addiction, staffed with members from the Department working at Mayaguez. The staff from the SEMIT program provides orientation and general guidance to the juveniles on the problems of drug addiction and on how to solve them to stop their addiction.

When the Treatment Committee discusses the cases of juveniles having drug addiction problems, a representative from the SEMIT program participates.

51. Each juvenile at Mayaguez has an individualized rehabilitation plan designed according to his needs. The rehabilitation plan for each juvenile is designed by the treatment committee, which is an interdisciplinary committee meeting approximately once a week, consisting of the Director of the institution, the social workers' supervisor, the social worker or social work technician assigned to each case, the registered nurse, the school principal, the supervisor of "encargados", a psychologist, and the institution's psychiatrist. Occasionally, a social worker from the local office covering the community of residence of a juvenile participates in these meetings.

52. One of the special programs in existence at Mayaguez is the PAEM, which is a program wherein a juvenile is allowed to work in nearby communities, for pay, with supervision by institutional authorities.

53. The academic program curriculum at Mayaguez includes the following subject matters: English, Spanish, Mathematics, Social Studies, and Physical Education.

The academic and vocational curriculum at Mayaguez meets the standards of, and is officially approved by, the Commonwealth's Department of Education. The grade years approved by the juveniles at Mayaguez are recognized within the public school system of the Commonwealth of Puerto Rico by the Department of Education of the Commonwealth.

During a normal day a juvenile spends from two and a half to three hours participating in the academic education program and from two and a half to three hours participating in the vocational education program.

The number of juveniles per classroom at the Mayaguez academic program fluctuates between ten and fourteen, a number that not only compares very favorably with the public and private school systems of the Commonwealth (where the average is close to 40 students per class) but also permits a highly satisfactory level of individual attention given to each juvenile at the classroom.

At any given time at Mayaguez, from fifteen to twenty juveniles participate in the special tutorial program in Spanish, English and Mathematics. The classes are small, sometimes on a one-to-one basis.

The objective of the tutorial program at Mayaguez is to identify those juveniles with the greatest potential for achievement and advancement and to assist them in realizing that potential to the maximum possible during their stay at Mayaguez.

The special tutorial program of Mayaguez has been effective in achieving this goal and in assisting juveniles in approving one, two or three scholastic grades during their stay at Mayaguez. In some cases juveniles have been assisted through this program to obtain their ninth grade diploma or their high school diploma.

54. The juveniles at Mayaguez are required to perform rutinary housekeeping and maintenance chores, within and around their living area, which have a therapeutic value and are consistent with the rehabilitative needs of the juveniles.

55. For recreational purposes Mayaguez has a baseball and softball field, a basketball and volleyball court, and a game room containing billiards, ping-pong, and weight lifting. The hours of the day in which each juvenile can participate in recreational activities vary, depending on the specific calendar of activities designed for each individual.

56. The social work component of the rehabilitative services offered to juveniles at Mayaguez benefits from an adequate scheme of direct contact with the juveniles, direct supervision by the institution's supervisor of social work and indirect supervision by the regional office's social workers' supervisor in Ponce and finally by the DSS's central supervisor for social work in San Juan. Both in terms of the qualifications of the personnel and in terms of the type and frequency of supervision received by the social workers who are in direct contact with the juveniles, and in terms of the techniques of social work, counseling and orientation used, as well as in terms of the frequency of the interviews between juveniles and their social workers, the rehabilitative services provided in this area to the juveniles assigned to Mayaguez compare satisfactorily with the standards for the profession of social workers prevailing throughout the Commonwealth of Puerto Rico.

57. The existing coordination between DSS and the Commonwealth's Department of Education, whereby the Department of Education approves the curriculum offered at the social treatment centers administered by the DSS, including Mayaguez, and whereby the Department of Education also issues licenses to the teachers working at the social treatment centers, Mayaguez included, and whereby the Department of Education of the Commonwealth recognizes the grade years, approved at Mayaguez and other social treatment centers for the purposes of reincorporating juveniles to the public school system of Puerto Rico, is an adequate scheme that guarantees that the quality of the educational program at Mayaguez is consistent with the standards set by the Commonwealth's Department of Education.

58. The academic education program at Mayaguez has been successful in obtaining the advancement of the juveniles assigned to Mayaguez at a faster rate than would be possible within the public system of the Commonwealth of Puerto Rico.

### Medical and Dental Services

59. As previously indicated, the medical and dental areas are located in the delapidated central administration building. They consist of a nursing station, the doctor's office, a psychiatrist's office, a dentist's office, and a five-bed ward.

60. The medical services offered at Mayaguez are basically the initial screening of new inmates and routine sickcall, primary care, and diagnostic services. For this type of medical care, the Mayaguez medical facility is minimally adequate, although its physical appearance leaves much to be desired esthetically.

Serious medical emergencies as well as specialized services such as neurological evaluations, ear, nose and throat and opthalmology services, are referred to the Mayaguez Medical Center, which is approximately ten minutes distance by automobile. This procedure appears to be adequate for the needs of the Mayaguez inmate population.

61. Juveniles with hepatitis, venereal diseases or other contagious sickness are placed in the cells of the intensive care or "isolation" unit, for lack of other facilities. This is a hazardous and medically unacceptable practice.

### Disciplinary Matters

#### Generally

62. We have previously indicated that the large majority of juveniles assigned to Mayaguez have been assigned to other less restrictive settings within the system of the DSS prior to transfer to Mayaguez and that those settings have proven inadequate and unsuccessful in controlling their behavior and in allowing for the rehabilitative proc-

ess to act upon the juveniles. It has also been pointed out that notwithstanding the strict control that is exercised in Mayaguez, there is an endemic escape problem in this institution. Furthermore, most of the juveniles involved in escapes from Mayaguez have a prior history of said actions from other less restrictive social treatment centers or other alternatives within the system.

63. The practice at Mayaguez is that the social worker assigned to each juvenile will normally play an active roll in determining whether the juvenile has incurred in behavior subject to disciplinary sanctions and in formulating whatever disciplinary sanctions may be imposed. This practice constitutes a positive element in the existing relationship between juveniles and their respective social workers.

64. Disciplinary measures and punishment are an integral part of the rehabilitative process of the juveniles assigned to that institution. Disciplinary measures as such are an important part of rehabilitative treatment.

65. A tendency of a juvenile to evade can and should be taken into consideration when determining the degree of controls that a given juvenile needs. Other factors that are relevant to the determination of the degree of controls needed by a juvenile are: the nature of the offense for which the juvenile has been placed under the custody of DSS; the number and nature of any prior offenses committed by the juvenile; the results of psychological, intelligence, and psychiatric evaluations made of the juvenile; whether the juvenile is involved in problems of drug addiction; the type of behavior and relations that the juvenile has with his immediate family and in his community of origin; whether the juvenile has had problems of misbehavior at detention centers, group homes, juvenile homes, and other social treatment centers; his age and physical strength; his responsiveness or lack of responsiveness to authority.

66. Generally speaking, the factors mentioned in Paragraph 65 are taken into account in taking disciplinary action against juveniles in Mayaguez, notwithstanding the failure of the staff to articulate said matters.

*Procedure*

67. The normal procedure followed by the staff at Mayaguez before administering a disciplinary measure may include the following: a meeting between the juvenile and his social worker; the social worker interviewing other persons who may have knowledge of relevant facts, including other juveniles, "encargados" or other employees; a consultation between the social worker and the social worker's supervisor or the Director; and the formulation of the disciplinary measure by the social worker. Consultation with the social worker's supervisor or with the Director occurs in the more serious instances. In the less serious cases the social worker may act on his or on her own.

In formulating the specific disciplinary measures with respect to a given juvenile's conduct, the social worker takes into consideration the nature of the offense, the previous history of offenses of the juvenile, the specific circumstances surrounding the offense, and the specific rehabilitative needs and characteristics of the juvenile. On weekends, evenings and holidays an "encargado" interviews the juvenile and decides upon the disciplinary sanctions, subject to eventual review by the social worker.

*Rules*

68. Although the Secretary of DSS testified that it was DSS policy to require written disciplinary rules, no such written rules appear to be available.

69. There are no definitive set of guidelines, written or otherwise, for the imposition of disciplinary sanctions. This lack of specifically enumerated rules and sanctions at times results in the arbitrary imposition of substantial disciplinary sanctions against incarcerated juveniles.

*Corporal punishment and physical abuse*

70. DSS and Mayaguez official policy prohibits corporal punishment or the use of

physical force against juveniles. There is evidence, nevertheless, of physical abuse taking place by the "encargados" against juveniles. The evidence is so conflicting and vague, however, that a definitive finding of fact of further specificity cannot be made. There is no doubt in the Court's mind, however, that physical abuse is taking place, particularly upon juveniles who are returned after an escape. There is no evidence that any of the individual defendants has either participated in or sanctioned any such conduct.

71. The authorities at Mayaguez and the DSS have a two-fold procedure to follow in instances where a juvenile complains that one or more employees have physically abused him. The social worker in charge of the juvenile's case is usually the first person to officially receive the complaint of the juvenile. After preliminarily investigating the facts, the social worker refers the matter to the local police and to the public prosecutor of the city of Mayaguez for investigation and any judicial action they may deem appropriate. The social worker also refers the matter to the Director of Mayaguez, who in turn refers it to the central office of the DSS for the appropriate internal administrative investigation and disciplinary action against the employee. Once the matter of a juvenile's complaint is informed to the local police or local prosecuting officer, the decision whether to proceed with the judicial action or not is outside of the discretion of the DSS personnel, it being handled through usual court channels and procedures.

72. Because of the probable reluctance of juveniles to file complaints against "encargados" and similar personnel, the procedure for controlling physical abuse in Mayaguez is in practice ineffectual.

73. There is a policy of DSS and of Mayaguez, that "encargados" shall not carry weapons of any nature in the course of their duties. Any such action is sanctioned with disciplinary measures. There is some evidence of isolated violations of this rule by indeterminate "encargados."

*Isolation*

74. It is a regular practice in Mayaguez to separate juveniles individually from the rest of the inmate population for disciplinary reasons. Juveniles so sanctioned are placed in the individual cells previously indicated as being located in the so-called intensive treatment or isolation unit.

75. Juveniles in said cells are only isolated physically from other juveniles inasmuch as they are able to talk to other juveniles in contiguous isolation cells.

76. The average length of stay in the isolation cells from September 18, 1979 to December 18, 1979 which is a representative period, was 13.3 days. There are, however, several known cases of juveniles having spent several months at one stretch in isolation.

77. The sole activity of juveniles while in isolation is eating and sleeping. They do not attend the Mayaguez academic or vocational school program and are not allowed any writing or reading material in their cells except the Bible. Furthermore, they are not allowed any physical exercise or recreation; the only time they are allowed out of the isolation cell is for a daily shower.

78. Juveniles are and have been placed in isolation for a number of reasons. The most common reasons for isolation are escape or attempted escape, overstaying a pass, or fighting with another juvenile or staff member (usually an "encargado"). Every juvenile who escapes or overstays a pass is automatically sent to the disciplinary unit. Juveniles have also been placed in isolation for being disrespectful or disobeying an "encargado"; failing to work; refusing to go to the beach; using obscene language; being suspected of smoking marijuana; "covering up" threatening to see a juvenile judge while out on pass; faking a hanging; self-mutilation; having hepatitis, venereal disease, or other infectious disease; having drug problems; and being an epileptic. In addition, the psychiatrist has in three years isolated some ten to fifteen juveniles for "therapeutic purposes", i.e., to

calm them down while in an acute psychotic state.

79. The social worker or an "encargado" makes the decision to isolate a juvenile. No hearing is given to the juvenile either before or after he is sent to isolation. There is no written procedure for the use of isolation as a disciplinary action. The social worker determines the length of the juvenile's stay in isolation. The juveniles are not told in advance the duration of their stay.

80. Isolation as a disciplinary measure, under the circumstances present in this case, entails a substantial curtailment of a juvenile's freedom.

*Outside Communication*

81. With respect to incoming mail for a juvenile, the institution's social worker or social work technician assigned to the juvenile, reads the juvenile's incoming mail and, depending on the contents, sometimes discusses the same with the juvenile or deletes parts of the letter that he or she understands to be against the rehabilitative needs of the juvenile. In these instances the juvenile reads the uncensored material but not the material that has been deleted by the social worker.

82. There is no censorship of outgoing mail sent by the juveniles.

83. Juveniles are not allowed to make or receive outside telephone calls except by permission of the Mayaguez staff.

*Passes*

84. With respect to the granting of passes to juveniles and to other aspects of the juveniles' relations with their communities of origin, Mayaguez maintains coordination with the social worker at the local offices of the Family Services Bureau.. The social workers at the local offices of the communities of origin of the juveniles give service to the relatives of the juveniles. These services are not necessarily related to the juveniles at Mayaguez. They also provide coordination and integration between their own efforts and those at Mayaguez or other social treatment center where juveniles may be assigned.

85. The coordination between the local offices of the Family Services Bureau and Mayaguez or other social treatment centers, includes providing background information to the social treatment center where the juvenile may be assigned. This information may assist in the design of the individualized treatment plan for the juvenile; in providing information at the request of the social treatment center or at their own initiative, that may assist the social treatment center during the treatment; and providing information and coordinated efforts to assist the social treatment center (including in every case at Mayaguez) in arranging for the discharge of juveniles to their communities of origin.

86. The practice at Mayaguez is, on the average, to grant a three-day pass each month to each juvenile.

87. A substantial number of juveniles overstay their passes or escape during passes.

### MARICAO

88. The Maricao Juvenile Camp is located in the mountains between Maricao and Sabana Grande, approximately 12 kilometers from each town and a 35 minute car ride from Sabana Grande. It is a minimum security facility, with no perimeter fence or bars of any nature. The facility is comprised of a series of one-story buildings and a two-story residential unit. The one-story buildings contain the academic classrooms and the various vocational training areas. All structures are of recent construction and are well maintained, among extremely pleasant rural surroundings. The residential unit contains two floors of dormitory-style living quarters. It is clean and although spartan in furnishings, is adequate for its purposes. Some of the bathroom facilities show signs of damage.

89. Although the maximum capacity of Maricao is 56 juveniles, it never even approaches that figure. From July 1975 to June 1977, the in-house population at Maricao averaged 24 with an average of 7 es-

capes per month. In April 1981, there were 21 juveniles and 7 escapees at Maricao. The capacity of the facility is 50. The average stay at Maricao was 11 months in 1977. Among the Maricao juveniles are included some who have committed serious crimes against persons as well as property, and other minor or status offenses. The institution had 4 status offenders in 1975, 8 in 1976, and 7 in 1977.

90. The organizational structure, the personnel structure, the coordination with other Bureaus in the Department, the coordination with the Commonwealth's Department of Education, the integration of the educational program within the public school system of the Commonwealth, and the relation and scheme of supervision with the Regional Office and Central Office of the DSS in Maricao, is similar to that existing at Mayaguez. The findings of fact of the Court with respect to Mayaguez on the aforementioned areas, apply similarly to Maricao.

91. The number of students per class at the Maricao Camp classrooms fluctuates between eight and twelve, a number that not only compares very favorably with the public and private school system of the Commonwealth (where the average is close to 40 students per class) but also permits a highly satisfactory level of individual attention given to each juvenile at the classroom.

92. Maricao has a well-structured vocational program in agriculture and general construction.

93. With respect to each of the different areas covered for Mayaguez, that is, physical facilities; food service; qualifications and adequacy of staff; living conditions; social work services; academic program; vocational training program; passes; visitations; admissions; transfers; organizational structure; individualized treatment plan; censorship of mail; personnel structure; treatment program; recreation and sports; psychological and psychiatric services; daily routine of juveniles and so forth, Maricao is functioning at adequate levels, comparing satisfactorily with the standards of professional services in similar areas of expertise prevalent in the Commonwealth of Puerto Rico.

94. Although there is no medical personnel assigned to Maricao, the existing arrangements made with medical facilities and professionals in the nearby town of Maricao and Sabana Grande have proven to be adequate for the needs of the Camp. There has not been any reported instance where a juvenile has been prejudiced by the existing arrangement.

95. Although Maricao is located in a somewhat secluded area, it is near enough to the towns of Sabana Grande and Maricao, and there are enough means of transportation available, so that location is not a problem. Considering the positive therapeutic value of the environment at Maricao, with its very cool climate, its panoramic view of the Southern coast of Puerto Rico, its healthy and abundant vegetation, and the availability of self-grown vegetables and grains, said factors more than make up any minor inconveniences caused by its location.

96. The Court's findings regarding the lack of written disciplinary procedures in Mayaguez are equally applicable to Maricao. There is no evidence of isolation being used in Maricao and the scant evidence of physical abuse is not given any credit, or in any event, because of its sporadic nature, does not appear to be a matter of concern.

97. Plaintiffs' and Plaintiff-Intervenor's allegations regarding the inadequacy of Maricao for the treatment of juveniles border on the frivolous.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this suit pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1343(3), 1345, 2201 and 2202.

2. This action is properly brought as a class action pursuant to Rule 23, F.R. C.P., the class comprising all juveniles currently committed, or to be committed, to Mayaguez or Maricao.

3. Defendants' actions in connection with the matters alleged in this case constitute action by color of state law within the meaning of 42 U.S.C. § 1983, and state action within the meaning of the due process clause of the Fourteenth Amendment.

4. Plaintiffs do not have a constitutional right to treatment. *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). Even assuming such a right exists, it is not applicable to Plaintiffs in that by reason of the Minor's Law of Puerto Rico, 34 L.P.R.A. 2001 et seq., the *quid pro quo* doctrine is inapplicable herein.

5. The conditions of confinement of juveniles at Mayaguez and Maricao are subject to review pursuant to the Cruel and Unusual Punishment Clause of the Eighth Amendment (*Morales v. Turman*, 562 F.2d 993 (C.A.5, 1977)), and the due process clause of the Fourteenth Amendment. *Martínez v. Rodríguez v. Jiménez*, 409 F.Supp. 594–595 (D.P.R., 1976).

6. With the exception of those matters hereinafter specifically stated, the conditions of confinement at Mayaguez, although far from ideal, and the conditions of confinement at Maricao, do not violate Plaintiffs' constitutional rights. It should be noted that not all illegal or undesirable actions by state officials give rise to an action pursuant to 42 U.S.C. § 1983. See *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977).

7. The following actions and practices by Defendants are in contravention of Plaintiffs' constitutional rights. There existing no adequate remedy at law, and it further appearing that Plaintiffs are suffering irreparable injury thereby, the Court hereby permanently enjoins Defendants from continuing said actions and practices and hereby ORDERS that:

(a) No juvenile shall by reason of any illness, sickness, or physical or mental defect or disease be committed to the so-called intensive care or "isolation" unit;

(b) No juvenile shall be submitted to physical or corporal abuse for any reason whatsoever. Defendants are hereby OR-DERED to establish an adequate procedure for the detection and correction of any such proscribed conduct. Said procedure shall be reduced to writing and posted in adequate places throughout the premises in Mayaguez and Maricao.

(c) Defendants shall, within 30 days from the entry of judgment, reduce to writing and post in adequate places throughout the premises of Mayaguez and Maricao, written disciplinary rules specifying proscribed conduct and sanctions to be imposed for violations thereof.

(d) No juvenile shall be confined in the so-called intensive care or "isolation" unit except after a hearing which gives the juvenile appropriate notification of the charges against him and an adequate opportunity to be heard and to contest the said charges. In the event of an emergency or because the nature of the circumstances make inappropriate the holding of a hearing prior to a juvenile's isolation, the hearing shall take place within 48 hours from the time he is so committed.

(e) No pre-trial juvenile detainee shall be confined to the so-called intensive care or "isolation" unit.

The Clerk Shall enter Judgment in accordance with this Decision and Order.

IT IS SO ORDERED.